UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RAYMOND MORRISON, JR.,

      Petitioner,

v.

      Case No. 3:22-cv-1123-HES-PDB

RICKY D. DIXON, SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS, et al.

      Respondents.

---

## **ORDER**

### **I. Status**

Petitioner Raymond Morrison, Jr., a Florida state prisoner serving a life sentence, initiated this action through counsel by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1, Petition or Pet.).[1] He has also filed a supporting Memorandum of Law (Doc. 10, Petitioner's Brief or Pet. Brief). Morrison challenges his state-court (Duval County, Florida) conviction for first-degree murder, armed robbery, and burglary, raising five enumerated grounds for relief. Respondents, on behalf of the State of Florida, submitted a

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system. Unless otherwise noted, pinpoint citations are to the page of the electronically filed document, which might not correspond to pagination on the "hard copy" of the document presented for filing.

response in opposition (Doc. 23, Response or Resp.), as well as exhibits from the state court record. (See Resp. at 68-70; Docs. 23-1 through 23-69). Morrison filed a brief in reply. (Doc. 27, Reply). This action is ripe for review.

## II. Background and Procedural History

In 1998, Morrison was convicted of "first-degree murder for the January 8, 1997, killing of Albert Dwelle, which occurred during the course of a robbery upon Dwelle in his apartment in Duval County," as well as "armed robbery with a deadly weapon and burglary of a dwelling with intent to commit a battery, with an assault or battery on Dwelle." Morrison v. State, 818 So. 2d 432, 437 (Fla. 2002) ("Morrison Direct"), cert. denied, 537 U.S. 957 (2002). The Supreme Court of Florida summarized the circumstances of the crime as follows:

> On January 9, 1997, the dead body of eighty-two-year-old Dwelle was found on the floor of his bedroom by service personnel from Meals on Wheels. An autopsy revealed numerous injuries on the body of Dwelle, including contusions and abrasions to the head, chest, arms, and hand. According to the medical examiner, Dwelle died from loss of blood due to two lethal knife wounds to the throat. One was a stab wound to the left side of the neck which penetrated to the depth of almost five inches, perforating the esophagus and nicking the cervical vertebrae. A second wound to the neck was described as an incised wound across the front of the throat. As a consequence, Dwelle aspirated the blood caused by the knife wounds to his neck.

2

Dwelle was disabled for many years, having suffered a stroke during a bout of typhoid fever at age six or seven. He could not use his left hand or arm, he could hardly stand up and walk, and he needed assistance to bathe, dress, and cook. Meals on Wheels delivered his meals once a day.

Investigation by police revealed that Morrison had visited his girlfriend, Sandra Brown, on January 8, 1997. Brown lived at the Ramona Apartments in an upstairs apartment directly across from Dwelle's apartment. Morrison spent the afternoon of January 8, 1997, socializing with Brown and her uncle at Brown's apartment. At some point in the late afternoon or early evening, Brown and Morrison walked to the local convenience store to buy some beer. Brown paid for the beer with money she had just received for babysitting. To her knowledge, Morrison did not have any money. They returned to Brown's apartment where they drank the beer with Brown's uncle. Brown's uncle later left to return to his own home. At about 9 p.m., Morrison prepared two steaks and placed them in the oven to cook. He then told Brown that he was going to take the trash out. He did not return to Brown's apartment and was not seen again by Brown until the next day at a different location. On that occasion, Morrison apparently avoided contact with Brown, who was attempting to talk to him to find out why he had left so abruptly the previous night.

Morrison was arrested on January 10, 1997, [at approximately 3:30 p.m.] by Officer Anthony Richardson, on a warrant for failure to pay child support. Immediately upon arrest, Morrison asked Richardson if "this [his arrest] was about that old man." Richardson told him that he was being arrested for failure to pay child support but that some homicide detectives also wanted to talk to him, so Richardson was taking him to the homicide office of the Jacksonville Sheriff's Office. Richardson then advised Morrison of his constitutional rights. Morrison learned that Richardson, in addition to being a police officer, was also a pastor in a local church. On the way to the police station, Morrison and Richardson discussed religion and Morrison's need to get his life in

3

order. Richardson then turned Morrison over to homicide detectives Terry Short and T.C. Davis.

During a lengthy interview about the Dwelle murder, Morrison told Short that he wanted to talk to Richardson again. Short paged Richardson and Richardson returned to the police station to talk with Morrison. On the morning of January 11, 1997, and following a discussion with Richardson, Morrison gave a written statement [at approximately 1:30 a.m.] detailing his involvement in the death of Albert Dwelle. The text of Morrison's written statement seen by jurors is as follows:

> On Wednesday 01–08–97 at approximately 9:00 PM I had been smoking crack with Big Man. I ran out of crack and had no money. I went to Apt. 68 and sat on the steps. I was drinking a beer. I wanted a cigar. I knocked on the door of Apt. # 64. The man came to the door and I ask him for a cigar. He started telling me he couldn't let me come in. I ask for a light for the cigar he gave me. He went back into his bed room to get me a light. I follow him to the bed room. He reached into his shirt pocket hanging on a chair by the bed and handed me a light. I put the lighter back on the chair. I saw money in the shirt pocket. I reached over and grabbed a few bills out of his shirt pocket. He saw me take the money. He got a knife from somewhere and began swinging it at me. I tried to grab him to defend myself and also not to hurt him. I grabbed him by the arm and turned him around so he was facing away from me. He was thrusting the knife back over his shoulders at me. I was holding his right arm and he was still thrashing the knife trying to cut me. While he was trying to cut me the knife accidentally cut across his throat. I didn't know at the time that it had cut him. I was still holding him and he got even wilder thrusting the knife and I guess he got cut again. That's when I saw he was cut.

4

> I laid him down on the floor and picked up the knife. I left the apartment and went to another part of the complex where I hid the knife under a brick.
>
> I then went to Big Mans house and got him to take me to the Chevron. We got gas and he took me to Marietta. When we got to Marietta I bought some drugs with the money I took from the old man. I then went back to Ramona Park where Big Man dropped me off and he went home. I saw my uncle Cap and I got in the car with him. I stayed with Cap until Friday morning and continued smoking dope and drinking till then. Police picked me up Friday after noon.

Morrison also said he took the victim's money and spent it on drugs and prostitutes. In addition, Morrison was seen shortly after the murder attempting to sell silver coins, similar in size and appearance to coins owned by Dwelle and missing from Dwelle's apartment after the murder. Finally, Morrison led the detectives to the knife that he said he used to kill the victim.

Morrison Direct, 818 So. 2d at 437-39 (per curiam opinion).

Recounting the procedural history, the Supreme Court of Florida continued:

The jury unanimously recommended the death penalty by a vote of twelve to zero and the trial court sentenced Morrison to death.[2] [Morrison Direct] at 439. The trial court found and gave weight to four aggravating factors: (1) Morrison was previously convicted of a felony involving the use or threat of violence to the person—great weight; (2) the murder was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing

---

[2] On armed robbery and burglary counts, the trial court sentenced Morrison as a habitual violent felony offender to life imprisonment on each, to be served consecutively to each other and the death sentence. (Doc. 23-27, Doc. 23-28).

5

or attempting to commit the crime of armed robbery or burglary with an assault or both—great weight; (3) the murder was especially heinous, atrocious, or cruel—great weight; and (4) the victim of the capital felony was particularly vulnerable due to an advanced age or disability—great weight. Id. Although the trial court found no statutory mitigation, it found and gave weight to eight nonstatutory mitigators: (1) good jail conduct in that Morrison presented no danger to the police when arrested, cooperated with the police during his detention, and led police to the murder weapon—some weight; (2) there would be no parole or other release from prison from a life sentence for first-degree murder—some weight; (3) Morrison cooperated with the police— some weight; (4) Morrison abused alcohol and cocaine and most likely used the robbery proceeds to purchase more alcohol and cocaine—some weight; (5) Morrison was employed—some weight; (6) Morrison has only borderline intellectual ability, and when combined with alcohol and drug abuse, it results in bad judgment—great weight; (7) Morrison has a positive family background and character, and assumed some responsibility for management of the home at an early age—some weight; and (8) Morrison adjusted well to incarceration, albeit with a record of an escape conviction—some weight. Id. at 439–40.

Morrison raised twelve issues on appeal: (1) whether the trial court erred in failing to adequately address Morrison's request for new counsel prior to trial; (2) whether the trial court erred in excusing a venireperson for cause because he was unsure if he would be able to vote for a death sentence if selected as a juror; (3) whether the trial court erred in sustaining the peremptory strike of venirepersons who expressed some opposition to the death penalty, but who were not excusable for cause; (4) whether the prosecutor's remarks to the venire improperly minimized the State's burden of proof so as to violate Morrison's rights to a fair trial and to due process of law; (5) whether the prosecutor's remarks made during closing argument improperly shifted the burden of proof to the defense; (6) whether Morrison's statements to police, induced by a law enforcement officer's appeal to Morrison's religious beliefs, were voluntary, such that the trial court did not err in denying

6

Morrison's motion to suppress; (7) whether the trial court erred in sustaining the State's objection to a question purportedly seeking to impeach the State's witness for having a self-interest; (8) whether the trial court improperly excluded testimony intending to impeach the State's witness based on an alleged reputation for dishonesty; (9) whether the trial court erred in denying Morrison's motion for judgment of acquittal as to first-degree murder and burglary; (10) whether the heinous, atrocious, or cruel aggravating circumstance statute is unconstitutionally vague and, therefore, its application in this instance is in error; (11) whether the statute and instruction for the aggravating circumstance that the victim of the capital felony "was particularly vulnerable due to advanced age or disability" is unconstitutionally vague and its application, in this instance, is an error; and (12) whether the imposition of the death penalty in this case is proportionate. Id. at 440 n.1. This Court affirmed Morrison's convictions and sentences [on March 21, 2002]. Id. at 458.

On September 18, 2003, Morrison timely filed his motion for postconviction relief. On March 28, 2014, Morrison filed an amended postconviction motion raising eleven claims, many of which contained numerous subparts: (1) Morrison was denied the effective assistance of counsel at the guilt phase; (2) the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, (1963); (3) Morrison was denied the effective assistance of counsel at the penalty phase; (4) newly discovered evidence establishes that Morrison's conviction and sentence violate the Constitution; (5) Morrison's death sentence violates the constitutional prohibition against cruel and unusual punishment because he is intellectually disabled; (6) the State intentionally destroyed exculpatory evidence; (7) counsel was ineffective for failing to ensure that Morrison had expert psychiatric assistance at the guilt phase and penalty phase; (8) counsel was ineffective for failing to object to the State's nonstatutory aggravators; (9) counsel was ineffective for failing to object to Morrison's absence from critical stages of the trial; (10) the trial court erroneously allowed the jury to hear evidence of a prior felony; and (11) cumulative error requires a new guilt phase and penalty phase. The postconviction

> court held an evidentiary hearing regarding Morrison's first nine claims on January 12–15, February 17–20, and March 18–19, 2015. Numerous lay and expert witnesses were presented during the ten-day evidentiary hearing.
>
> On September 18, 2015, the postconviction court entered an order granting Morrison a new guilt phase and penalty phase based on some of his claims of ineffective assistance of counsel, namely, subparts of claims one and three. State v. Morrison, No. 16–1997–CF–00991–AXXX–MA (Fla. 4th Cir. Ct. Sept. 18, 2015) (Postconviction Order). The postconviction court denied all of Morrison's remaining claims except for his claim of cumulative error, which it declined to rule on because it was granting Morrison a new trial. Id.

State v. Morrison, 236 So. 3d 204, 210-12 (Fla. 2017) (Morrison Collateral) (footnote added), cert. denied, 586 U.S. 835 (2018).

The State appealed the order granting postconviction relief. Morrison Collateral, 236 So. 3d at 208. Morrison cross-appealed the trial court's order to the extent it denied four of his postconviction claims and declined to conduct a cumulative error analysis. Id. The Florida Supreme Court reversed the portion of the order granting Morrison a new guilt phase, affirmed the portions granting a new penalty phase and denying Morrison's other asserted grounds, and rejected Morrison's claim of guilt phase cumulative error. Id. at 208-09. The Supreme Court of the United States denied Morrison's ensuing petition for certiorari. Morrison v. Florida, 586 U.S. 835 (2018). On remand to the state trial court, it resentenced Morrison to life imprisonment on the murder

8

conviction, with the concurrent life sentences on the robbery and burglary counts remaining unchanged. (Doc. 23-69).

Morrison filed this instant federal habeas Petition pursuant to 28 U.S.C. § 2254.[3] (Pet.) He raises five enumerated grounds for relief, as follows:

> **Ground I**: Trial counsel was ineffective in failing to adequately challenge the admissibility of Morrison's statements to law enforcement (Pet. at 39-44; Pet. Brief at 5-13);
>
> **Ground II**: Trial counsel was ineffective in failing to investigate and prepare for the guilt phase of the trial (Pet. at 44-49; Pet. Brief at 13-16);
>
> **Ground III**: The State withheld material favorable evidence in violation of <u>Brady</u> (Pet. at 50-56; Pet. Brief at 16-21);
>
> **Ground IV**: law enforcement violated Morrison's constitutional rights when a "preacher/officer … extracted statements" by taking Morrison "to the chapel to exploit his sincerely felt religious beliefs and anxieties" (Pet. at 56-57; Pet. Brief at 21-24); and
>
> **Ground V**: The trial court violated Morrison's constitutional rights by disallowing Morrison from presenting evidence concerning the credibility of a witness, Sandra Brown. (Pet. at 57-63; Pet. Brief at 24-25).

The State filed a Response opposing all claims. Morrison has filed a Reply, addressing the State's arguments opposing Grounds I, II, and III.

---

[3] The State acknowledges that Morrison filed the Petition within the one-year limitations period of 28 U.S.C. § 2244(d). (Resp. at 6).

(Reply). While Morrison's Reply does not address Grounds IV or V, he does not concede those claims but instead relies on the arguments set forth in his Petition and Brief. (Id. at 1).

## III. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Paris's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## IV. Governing Legal Principles

10

## A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is

11

unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 125-26.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97–98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000), § 2254(d)(1)

consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. [12, 18] (2013); accord Brumfield v. Cain, 576 U.S. [305, 322] (2015)]. Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at [18] (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

13

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any

14

constitutional issues by invoking one complete round of the State's established

appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–366; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies

results in a procedural default which raises a potential bar to federal habeas

review. The United States Supreme Court has explained the doctrine of

procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will

15

> not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman [v. Thompson, 501 U.S. 722, 747-48 (1991); [Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977)]. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. 307, 316 (2011); Beard v. Kindler, 558 U.S. 53, 60-61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting [Murray v. Carrier, 477 U.S. 478, 488 (1986). Under the prejudice prong, [a petitioner] must show

16

> that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be

17

credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (first citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); and then <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [<u>Strickland</u>,] 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. <u>Id.</u>, at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

> the outcome." <u>Id.</u>, at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, 562 U.S. at 105. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was

19

unreasonable — a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

### V. Findings of Fact and Conclusions of Law

#### <u>Ground I</u>: Counsel was Ineffective for Failing to Adequately Challenge Morrison's Statements to Law Enforcement.

Morrison first claims that his trial attorneys, Ronald Higbee and Rafik Eler, were constitutionally ineffective in failing to "adequately challenge" Morrison's statements to law enforcement. (Pet. at 39-44; Pet. Brief at 5-13). The State argues that the Florida Supreme Court denied this claim on the

20

merits and that relief is likewise due to be denied on habeas review under § 2254(d). For the reasons explained below, the Court agrees with the State.

Prior to trial, Higbee, Morrison's first appointed counsel, moved to suppress Morrison's statements to law enforcement, including his written statement (Doc. 23-3), as well as physical evidence discovered as a result of the statements. (Doc. 23-4). Higbee argued that the statements were unconstitutionally obtained because Morrison had invoked his rights to remain silent and to counsel and because the statements had been coerced, including by law enforcement appealing to Morrison's religious beliefs. The trial judge, Circuit Judge Henry E. Davis, held a pre-trial hearing on the motions to suppress on November 13, 1997. (Doc. 23-5). He heard testimony from Morrison; his mother, Georgia; and the three law enforcement officers who had spoken with Morrison: Detectives Davis and Short and Officer Richardson. (See id. at 4). Morrison testified at the hearing that he was read and understood his Miranda[4] rights at the interrogation. (Id. at 150). He also acknowledged he had not consumed drugs or alcohol since about 2:30 a.m. on January 10, 1997, about thirteen hours prior to his arrest at approximately 3:30 p.m. that same day. (Id. at 136, 149). The three law enforcement officers

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

21

each testified that they did not detect that Morrison was impaired or under the influence of drugs or alcohol. (Id. at 12-13, 59-61, 83-85).

In January 1998, after the evidentiary hearing but before the trial court ruled on the motions to suppress, Eler replaced Higbee as defense counsel. Eler and the prosecutor thereafter stipulated that the trial court might also consider testimony from Morrison's uncle, Reginald "Fred" Austin. (Doc. 23-14). Specifically, the parties provided a written stipulation stating that, if Austin were to testify, he would state that "on the evening of January 9, 1997, and in the early morning hours of January 10, 1997," the day of Morrison's arrest, Morrison had taken "cocaine or cocaine derivatives" and appeared at that time to be "high." (Id.)

On March 19, 1998, the trial court issued an order that denied the motion to suppress Morrison's statements to Detective Short, which included the written statement; granted the motion to suppress Morrison's statements to Officer Richardson (which the State did not contest); and denied the motion to suppress the physical evidence. (Doc. 23-15). The trial court found in its order that: (1) Morrison had never asked for an attorney, (2) he did not state or indicate that he did not wish to talk to Detective Short, (3) the statements to Detective Short were not the product of intimidation, (4) Morrison gave the

22

statements almost twenty-four hours after he last consumed alcohol or cocaine, and (5) Morrison's behavior from the time of his arrest to the time he gave the statements showed that he was sober and rational. The trial court further found that the statements were made after a valid waiver of his Miranda rights. (Id.)

In September 2003, after being convicted at trial, sentenced to death, and his direct appeal denied, Morrison filed a counseled motion in the state trial court seeking relief pursuant to Rule 3.851, Fla. R. Crim. P. (Doc. 23-38). He filed amended motions in March 2014 (Doc. 23-39) and February 2015 (Doc. 23-41). In the first amendment, he raised claims alleging, among other things, that trial counsel had been ineffective at the guilt phase, including by failing to investigate and present additional evidence in support of the motion to suppress Morrison's statements. (Doc. 23-39 at 11-15, ¶¶ 19-33). Specifically, Morrison's claims included that that counsel failed to retain mental health experts to testify regarding the voluntariness and reliability of his statements. (Id. at 11, ¶ 20). Morrison also argued that counsel failed to present evidence that he "had been using crack within the days and hour preceding the interrogation" and that the effects "would have been long-lasting and effected the voluntariness and veracity of his statement." (Id. at 14, ¶ 29). In addition,

23

Morrison complained that counsel should have consulted with experts and Morrison's friends and family regarding his history of having "previously 'copped to' or 'taken charges' with which he had nothing to do." (Id. at 14-15, ¶ 30).

Judge Davis was still on the bench and assigned to hear Morrison's Rule 3.851 motion. He held an evidentiary hearing on the claims over approximately ten days between January and March 2015. (Doc. 23-42 through Doc. 23-51). The Florida Supreme Court summarized the relevant testimony on this claim at the hearing as follows:

> At the postconviction evidentiary hearing, Morrison presented the expert testimony of Dr. Hyman Eisenstein and Dr. Joseph Wu to address, in part, his mental health at the time of the interrogation. Dr. Eisenstein, a neuropsychologist, diagnosed Morrison with organic brain damage, intellectual disability, and a substance abuse disorder. Dr. Eisenstein found that Morrison's substance abuse, brain injuries, and premature birth contributed to his organic brain damage. Dr. Eisenstein also concluded that Morrison's substance abuse impairs his cognitive abilities and that Morrison would admit to crimes he did not commit. Dr. Wu, a psychiatrist, testified regarding a PET scan of Morrison's brain and found that he had abnormal brain metabolism consistent with someone who likely has significant impairment on IQ. Dr. Wu also found that Morrison had an abnormal pattern to his frontal lobe consistent with a head injury. Morrison presented the testimony of Delores Tims (Morrison's acquaintance) in support of his crack cocaine use within hours of his interrogation. Tims testified that Morrison was using crack cocaine at the time of his arrest on January 10, 1997. Morrison also presented the testimony of Joseph Turner (Morrison's friend) and Terry Heatly (Morrison's cousin) in

24

support of his propensity to take the blame for others' crimes. Turner testified that Morrison previously "confessed to a crime [he] did not commit," and Heatly testified that Morrison "would hold drugs for drug dealers and admit the drugs were his when the police came around."

Morrison Collateral, 236 So. 3d at 214 (footnote omitted).

On September 29, 2015, the state trial court entered an order resolving the Rule 3.851 motion. (Doc. 23-58). On this claim, the trial court granted relief, holding that Morrison was entitled to a new guilt phase. (See id. at 25-36, 122). Explaining that ruling, the trial court's order opined as follows as to the significance of the testimony of Dr. Wu and Dr. Eisenstein:

> Given the findings of these mental health experts, it is likely Defendant had a significantly impaired mental state at the time of the interrogation. Because Defendant's statement was the key piece of evidence against Defendant, it was unreasonable for counsel not to investigate Defendant's mental state at the time of the statement. Dr. Wu and Dr. Eisenstein's conclusions are extremely relevant to determining the impact Defendant's mental state had on his statement to the police. Had defense counsel presented such evidence, the Court at the suppression hearing or the jury at trial could have used it to evaluate the voluntariness and veracity of Defendant's statement.

(Id. at 31).

The trial court also addressed the hearing testimony as it related to the experts' conclusions regarding Morrison's use of crack cocaine:

> The State argues that sufficient time had passed between the time of Defendant's arrest when he was admittedly using crack until

25

the time he made his statement to clear any intoxicating effects of the crack. The experts' conclusions, however, challenge that theory. Had counsel been more diligent, he would have addressed this point if not at the suppression hearing, then at trial. Dr. Eisenstein and Dr. [Greg] Pritchard's testimonies about the effects of Defendant's alcohol and drug abuse on his brain functions lend credence to Defendant's instant claim that his substance abuse had a deleterious effect on his statement to the police. Counsel failed to present evidence that Defendant's crack use before Defendant's arrest undermined his statement to the Detectives. Counsel's failure to present such testimony establishes a "probability sufficient to undermine confidence in that outcome." See Strickland, 466 U.S. at 693-94.

(Id. at 33).

Next, the trial court addressed the testimony by Turner and Heatly to the effect that Morrison had previously confessed to crimes he did not commit, as well as testimony from Dr. Eisenstein such suggested that Morrison was susceptible to take responsibility for things he did not do:

This evidence was readily available to counsel given Mr. Turner's role in Defendant's prior felony conviction, and it was unreasonable for counsel not to investigate this information. Moreover, couple with Dr. Eisenstein's conclusions, this evidence would have illustrated how Defendant could inculpate himself in Mr. Dwelle's death and could have aided the jury in weighing the veracity of Defendant's statement. As discussed, the State relied heavily upon Defendant's confession at trial. Counsel's failure to present evidence of Defendant's propensity to take the blame for otherwise undermines confidence in the outcome of the proceedings.

(Id. at 35).

26

Finally, the trial court summarized its reasons for granting relief on the claim:

> Defendant has … shown counsel's performance was deficient because he failed to retain mental health experts to describe and explain how Defendant's mental state during his interrogation with the police would impact the voluntariness and reliability of the statement. Similarly, counsel's failure to investigate Defendant's crack use within hours of his interrogation prevented the Court at the suppression hearing and the jury at trial from learning the effects crack had on Defendant's statement. Finally, Defendant's history of admitting to crimes he did not commit is evidence that challenges the veracity of Defendant's statement. Counsel's failure to reasonably investigate and locate this evidence constitutes deficient performance. It is reasonable to find this evidence, had it been presented, could have changed the outcome of the proceedings.

(Doc. 23-58 at 36).

The State appealed, and the Florida Supreme Court reversed the grant of relief on the claim. Morrison Collateral, 236 So. 3d at 213-17. The Florida Supreme Court first found that that the trial court applied the wrong standard for prejudice under Strickland. Id. at 214-15. Specifically, the Florida Supreme Court noted that the trial court "ultimately concluded that Morrison was prejudiced by trial counsels' deficient performance because 'it is reasonable to find this evidence, had it been presented, could have changed the outcome of the proceedings.'" Id. at 215 (quoting Doc. 23-58 at 36) (emphasis in Morrison Collateral). By contrast, the Court emphasized, Strickland requires a

27

defendant to "show there is a <u>reasonable probability</u> that, but for counsel's unprofessional errors, the result of the proceeding <u>would</u> have been different." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694 (emphasis in <u>Morrison Collateral</u>)).

The Florida Supreme Court then proceeded to conclude that Morrison had failed to demonstrate prejudice under the proper <u>Strickland</u> standard:

> Morrison has not shown that the evidence presented at the postconviction evidentiary hearing would have led the trial court to suppress or the jury to disregard Morrison's written statement to the police as involuntary. "In examining whether a defendant's confession may be used as evidence against him, '[t]he test is ... one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession.'" <u>Baker v. State</u>, 71 So. 3d 802, 814 (Fla. 2011) (alterations in original) (quoting <u>Owen v. State</u>, 862 So. 2d 687, 695 (Fla. 2003)). "Moreover, '[t]o establish that a statement is involuntary, there must be a finding of coercive police conduct.'" <u>Id.</u> (alteration in original) (quoting <u>Schoenwetter v. State</u>, 931 So. 2d 857, 867 (Fla. 2006)). "Thus, whether a confession is admissible depends on (1) whether the interrogating officers engaged in coercive activity, and (2) whether that activity was sufficient to overcome the free will of the defendant." <u>Id.</u> "[T]he salient consideration in an analysis of the voluntariness of a confession is whether a defendant's free will has been overcome." <u>Blake v. State</u>, 972 So. 2d 839, 844 (Fla. 2007) (alteration in original) (quoting Black v. State, 630 So. 2d 609, 614–15 (Fla. 1st DCA 1993)). The ultimate issue of voluntariness is a legal rather than factual question. <u>McCloud v. State</u>, 208 So.3d 668, 677 (Fla. 2016).
>
> A review of the totality of the circumstances here confirms that Morrison voluntarily gave the written statement to the police. Morrison's written statement was not the product of improper coercion. Morrison was not threatened or mistreated during the interrogation, and the police did not make any promises to

28

Morrison in exchange for his written statement. Although the police appealed to Morrison's religious beliefs, we conclude that their appeals were not so coercive as to render his written statement involuntary. As the trial court found following the motion to suppress hearing, Morrison gave the written statement after validly waiving his <u>Miranda</u> rights. Morrison was advised of his <u>Miranda</u> rights at the time of arrest. Morrison was also advised of his <u>Miranda</u> rights when he arrived at the police station. At that time, Morrison signed a standard form attesting to the fact that he had been advised of his <u>Miranda</u> rights. Morrison was also reminded of his <u>Miranda</u> rights before he gave the written statement to the police. Although Morrison presented testimony at the postconviction evidentiary hearing regarding his mental health, the evidence is that Morrison clearly knew and understood his rights at the time of the interrogation, and Morrison has not shown otherwise. Morrison never asked for an attorney or stated or indicated that he did not wish to talk to Detective Short. Even accepting Tims' testimony [indicating that Richardson saw Morrison smoke crack cocaine when he arrested him at about 3 p.m. on January 10th], Morrison gave the written statement at least ten hours after he last consumed alcohol or cocaine and Morrison's behavior from the time of his arrest to the time he gave the written statement showed that he was sober and rational. Morrison never testified at the motion to suppress hearing or at the postconviction proceedings that he confessed to the police and was taking the blame for others, which would have contradicted his own testimony at the motion to suppress hearing that "he did not provide any inculpatory statements to [the] police." [<u>Morrison Direct</u>], 818 So. 2d at 446. In any event, the testimony presented at the postconviction evidentiary hearing regarding Morrison's purported propensity to take the blame for others' crimes does not establish that Morrison did so in this case or render Morrison's written statement involuntary under the totality of the circumstances presented.

Nor has Morrison shown that the evidence presented at the postconviction evidentiary hearing would have led the jury to disregard his written statement as unreliable. Morrison's written

29

statement established that he knew the location of the murder weapon, which is consistent with the significant fact that "Morrison led the detectives to the knife that he said he used to kill the victim," id. at 439, and the State presented evidence at trial that blood located on the blade of the knife matched the DNA of the victim. Morrison's written statement established that he knew that the victim's throat was sliced and stabbed with the victim's own knife, which was consistent with the evidence presented at trial. See id. at 437–39, 452. Morrison's written statement indicated that he went to the victim's apartment sometime after 9 p.m. on January 8, 1997. See id. at 438. Consistent with the written statement, Sandra Brown (Morrison's girlfriend) placed Morrison near the scene of the crime on the night of the murder. See id. Morrison's written statement also indicates that he stole money from the victim, which is consistent with the fact that "Morrison was seen shortly after the murder attempting to sell silver coins, similar in size and appearance to coins owned by [the victim] and missing from [the victim's] apartment after the murder." Id. at 439. Furthermore, immediately upon arrest, Morrison asked if the arrest "was about that old man." Id. at 438.

Under these circumstances, Morrison cannot demonstrate prejudice such that our confidence in the outcome is undermined. We therefore reverse the postconviction court's granting of a new guilt phase on this issue.

Morrison Collateral, 236 So. 3d at 215-17 (footnotes omitted).

Morrison re-asserts this claim as Ground I of his federal habeas Petition. (Pet. at 39-44; Pet. Brief at 5-13). He concedes that the Florida Supreme Court rejected the claim on the merits based on Strickland's prejudice prong and that such decision is therefore entitled to deference under 28 U.S.C. § 2254(d). (Pet. Brief at 5; see also Resp. at 25-33). Morrison maintains, however, that the

30

decision was contrary to, and an unreasonable application of <u>Strickland</u>, and was based on an unreasonable determination of the facts. (Pet. Brief at 5).

Morrison first contends that the Florida Supreme Court decision was unreasonable because it is incorrect, he says, in its determination that the trial court applied the wrong legal standard for prejudice under <u>Strickland</u>. Morrison highlights that the trial court's order unambiguously quoted the correct <u>Strickland</u> standard when laying out the law applicable to ineffective assistance claims generally. (<u>See</u> Pet. Brief at 6; Doc. 23-58 at 16). Morrison further points out that, in discussing the claim itself, the trial court's order also contains language indicating that the trial court applied the correct standard. (<u>See</u> Pet. Brief at 6-7).

However, even assuming that the Florida Supreme Court was, in fact, incorrect to find that the state trial court failed to apply the proper standard for assessing prejudice under <u>Strickland</u>, it would not matter. The Florida Supreme Court's rejection of this claim on the merits for failure to show prejudice under <u>Strickland</u> is the last reasoned state court decision. Accordingly, it is that decision, not the state trial court's reversed order granting relief, that is owed deference on habeas review under § 2254(d). <u>See</u> <u>Wilson</u>, 584 U.S. at 125; <u>Shimel v. Warren</u>, 838 F.3d 685, 696 (6th Cir. 2016).

31

Accordingly, what matters is whether the Florida Supreme Court applied the correct legal standard for prejudice under Strickland, not whether the trial court did.

Also, when a Florida state trial court rules on an ineffective assistance of counsel claim after an evidentiary hearing, a reviewing appellate court will defer to the trial court's findings of fact to the extent they are supported by substantial evidence, but the appellate court reviews de novo the trial court's conclusions as to whether counsel's performance was deficient and prejudiced the defendant. Smith v. State, 330 So. 3d 867, 875 (Fla. 2021); Stephens v. State, 748 So. 2d 1028, 1031-34 (Fla. 1999); accord United States v. Smith, 983 F.3d 1213, 1220 (11th Cir. 2020). Therefore, even had it concluded that the trial court had applied the correct legal standard under Strickland, the Florida Supreme Court still would have engaged in a plenary review of the trial court's conclusion that Morrison had established prejudice, which involved a mixed question of law and fact.

Morrison also makes a related argument that the Florida Supreme Court's decision was unreasonable because it failed to recognize that the trial court judge who presided at the Rule 3.851 proceeding and found prejudice,

32

Judge Davis, also ruled on the motion to suppress and presided at trial. (See

Pet. Brief at 7-8). Morrison thus contends that

> Judge Davis was uniquely positioned to determine whether there was a 'reasonable probability … the result of the proceeding would have been different,' since he was solely responsible for deciding the suppression of the statement at trial. His determination that it would have undermined confidence in his decision at trial cannot be understated as it is demonstrates the strength of the evidence presented in postconviction.

(Reply at 6).

This argument is misguided. Again, when reviewing an ineffective

assistance claim, the Florida Supreme Court defers only to a trial court's

findings of pure fact, which do not include a ruling on whether a defendant

suffered prejudice under Strickland; that ultimate determination is a mixed

one of law and fact and is reviewed de novo. Further, Strickland itself makes

clear that the "assessment of prejudice should proceed on the assumption that

the decisionmaker is reasonably, conscientiously, and impartially apply the

standards that govern the decision" and not based "on the idiosyncrasies of the

particular decisionmaker." 466 U.S. at 695. In other words, the prejudice

determination is to be made "objectively," without regard for the subjective

assessments of an individual judge. Hill v. Lockhart, 474 U.S. 52, 59-60 (1985).

Accordingly, that the same judge presided at Morrison's the suppression

33

hearing, the trial, and the postconviction proceedings is not relevant to the prejudice inquiry. See Williams v. Allen, 542 F.3d 1326, 1344-45 (11th Cir. 2008).

Finally, to the extent Morrison complains that the Florida Supreme Court failed to give proper deference to any determination made by the state trial court, whether on an issue of fact, law, or a mix of the two, such would implicate only an issue of state law, not the United States Constitution, and would not be a basis for federal habeas relief. See Greene v. Georgia, 519 U.S. 145, 145-47 (1996) (recognizing that the Georgia Supreme Court would be free, but not required under the Constitution, to adopt a presumption of correctness for state trial court findings regarding juror bias when reviewing related federal claims); Shimel, 838 F.3d at 697 ("Shimel's argument boils down to a complaint that the Michigan Court of Appeals unreasonably applied the state-mandated standard of review. This is not a ground on which we can grant habeas relief.").

Morrison next argues that the Florida Supreme Court did, in fact, apply the wrong standard for prejudice under Strickland. He points to a statement in the opinion noting that he had failed to "show that the evidence undermining his statements 'would have led the trial court to suppress or the jury to

34

disregard Morrison's statement to the police as involuntary.'" (Pet. Brief at 7, quoting Morrison Collateral, 236 So. 3d at 215). He argues that "[t]his outcome determinative standard was specifically rebuked by the Supreme Court in Strickland," which there recognized that "'a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case.'" (Id., quoting 466 U.S. at 693-94).

However, the Florida Supreme Court's opinion quoted and otherwise unambiguously acknowledged the correct "reasonable probability" formulation for prejudice under Strickland multiple times. See Morrison Collateral, 236 So. 3d at 213, 215, 218, 222. As such, the fact that a particular sentence in the opinion, read in insolation, might not clearly reflect the correct standard in its entirety does not demonstrate that the Florida Supreme Court applied the wrong standard. See Woodford v. Visciotti, 537 U.S. 19, 22-24 (2002). This argument is without merit.

Morrison also criticizes the Florida Supreme Court for failing to "consider the evidence presented at the evidentiary hearing in conjunction with the evidence presented at trial," but having instead "viewed the evidence from the trial about the interrogation in a vacuum." (Pet. Brief at 8). Morrison here misunderstands the Florida Supreme Court's analysis. That Court

35

correctly recognized that Morrison could potentially establish prejudice under Strickland in either of two ways. Both require showing a reasonable probability that he would not have been convicted at trial, but they involve different ways of getting there. First, Morrison could show that, had counsel offered the additional testimony he asserts that counsel was constitutionally required to have investigated and discovered at the suppression hearing, there is a reasonable probability both that the motion to suppress would have been granted and that, without his inculpatory statements in evidence at trial, the jury's verdict would have been different. See Kimmelman v. Morrison, 477 U.S. 365, 375, 381-82 (1986). But even if his statements were deemed admissible, he would have been entitled to present evidence at trial in an effort to convince the jury to reject the statements as not credible. See Crane v. Kentucky, 476 U.S. 683, 688-90 (1986); Palmes v. State, 397 So. 2d 648, 653 (Fla. 1981). Thus, Morrison could alternatively show prejudice under Strickland by establishing that, even with his inculpatory statements in evidence, there is a reasonable probability that the additional testimony from the postconviction hearing, presented at trial, would have led the jury to discount his statements and thereby reach a different verdict. See Williamson v. Ward, 110 F.3d 1508, 1519-20 (10th Cir. 1997); Amunga v. Jones, 51 F. App'x 532, 542-43 (6th Cir. 2002).

36

The Florida Supreme Court separately considered each potential avenue of prejudice. It first held that, even considering the testimony from the postconviction hearing, Morrison's statements remained voluntary and admissible and that the motion to suppress would have therefore still been denied. See Morrison Collateral, 236 So. 3d at 215-16. Because what mattered in that analysis was the voluntariness and admissibility of the statements, it was appropriate to limit the review to consideration of the evidence related to the interrogation presented at the suppression hearing in light of the relevant new evidence from the postconviction hearing. That's what the Florida Supreme Court did. See id. It then proceeded to hold that Morrison also failed to show that the evidence presented at the postconviction hearing would have led the jury to disregard his statements as unreliable and reach a different verdict. Morrison Collateral, 236 So. 3d at 216-17. The opinion shows that, in that analysis, the Florida Supreme Court properly considered Morrison's new evidence against the evidence presented at the trial on the merits, including Morrison's inculpatory statements. See id. Morrison's argument is without merit.

Morrison raises several arguments attacking the Florida Supreme Court's analysis of the evidence underlying its conclusion that he failed to

37

establish prejudice under Strickland. (Pet. Brief at 8-13). These include general assertions that the Florida Supreme Court "failed to adequately consider the extensive testimony and evidence relied upon by the circuit court" (id. at 8); "regurgitate[d] evidence that has been severely weakened" (id. at 9); and "failed to consider the totality of the evidence." (Id. at 11). Broadly speaking, however, such characterizations do little more than express disagreement with the Florida's Supreme Court's conclusion that Morrison failed to establish prejudice; they do not show that such was unreasonable under either prong of § 2254(d).

However, Morrison does make some specific contentions regarding the Florida Supreme Court's analysis of the evidence. He claims, for example, that the Florida Supreme Court's reference to at least ten hours having passed between the time Morrison had used intoxicants and when he made his written statement as supporting the voluntariness and reliability of his statement "ignored the testimony of experts related to the lengthy effects of cocaine and alcohol on the brain." (Pet. Brief at 9). He similarly asserts that Court "overlooked the lengthy duration of the interrogation and the fact that Morrison had not slept for many hours when he signed the written statement." (Id. at 9 n.2).

The Florida Supreme Court discussed in detail the timeline and events immediately surrounding Morrison's arrest and interrogation, his preceding drug use, and his inculpatory statements, evidence of which was also presented at trial. See Morrison Collateral, 236 So. 3d at 209-10, 213-16. That Court also discussed the expert testimony presented at the postconviction hearing related to Morrison's "mental health at the time of the interrogation," including his alcohol and drug use. See id. at 214, 216-17. Even to the extent that the opinion might not expressly discuss a particular fact or item of evidence, that does not imply that the Florida Supreme Court "ignored" or "overlooked" it or that its decision was an unreasonable application of Strickland. "[A] state court's written opinion is not required to mention every relevant fact or argument in order for AEDPA deference to apply. [Federal courts] still examine what other implicit findings the state court could have made in its denial of a federal claim." Pye v. Warden, Georgia Diagnostic Prison, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc) (quoting Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1223 (11th Cir. 2013) (ellipses omitted). Thus, "a line-by-line critiquing of the state court's reasoning is not the proper approach" under AEDPA. Id. at 1038 (quoting Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1350 (11th Cir. 2019) (internal quotation marks omitted). Morrison fails to show that the

39

Florida Supreme Court's prejudice determination is unreasonable under § 2254(d) based on its treatment of the expert testimony related to the effects of drugs and alcohol generally or because the Court might not have explicitly further discussed the length of the interrogation or when Morrison had last slept.

Finally, Morrison maintains that the Florida Supreme Court relied too heavily on certain evidence it recognized as tending to corroborate his inculpatory statements. (Pet. Brief at 11-13). These include that: (1) Morrison advised police of the location of the knife that had blood on the blade that matched the victim (id. at 11); (2) upon being arrested, Morrison immediately asked Richardson whether it was "about that old man" (id.); (3) Morrison's description of the victim's injuries in his statement was consistent with them (id.); and (4) Morrison indicated he had taken money from the victim, and Morrison was seen selling coins similar to ones missing from the victim's apartment (id. at 12-13). Morrison argues such evidence actually had little corroborative value and that the Florida Supreme Court failed to acknowledge countervailing considerations. Morrison contends, for example, that he denied taking the police to the knife and that it was allegedly left in plain sight. He similarly asserts that his question about the "old man" and his knowing about

40

circumstances of the crime were unimportant because people in the neighborhood knew and had been talking about the crime. Morrison also argues that the Florida Supreme Court "overlooked" postconviction hearing testimony recognizing that DNA from blood found on the handle of the knife did not match Morrison or the victim and that Morrison's statement to police does not mention taking "coins" specifically.

While these arguments are not incoherent, none ultimately convinces that the Florida Supreme Court's decision is unreasonable. Many of these facts and issues were brought out at trial but presumably discounted by the jury. And while the evidence about other DNA on the knife handle is favorable to Morrison, he does not claim that the prosecution had such evidence at the time of trial and suppressed it in violation of Brady, nor did Morrison argue in state court that defense counsel was ineffective for failing to seek such DNA testing for trial. The Florida Supreme Court also specifically discussed the issue elsewhere in its opinion. Morrison Collateral, 236 So. 3d at 224. The Florida Supreme Court was not unreasonable in concluding that the additional evidence that counsel was allegedly ineffective in failing to investigate and present would not have altered the jury's assessment of Morrison's statements or his guilt. And, again, the fact that the opinion might not have explicitly

41

discussed a particular fact or piece of evidence does not imply that it was overlooked or that the adjudication of the claim was unreasonable under § 2254(d). See Pye, 50 F.4th at 1036.

Morrison fails to show that the Florida Supreme Court's decision that he did not show prejudice on this claim is not contrary to, or an unreasonable application of, Strickland for purposes of § 2254(d)(1). Habeas relief is denied on Ground I.

### Ground II: Counsel was Ineffective in Failing to Investigate and Present Evidence at the Guilt Phase.

In his second ground for habeas relief, Morrison argues that his counsel was ineffective in failing to investigate and prepare for the guilt phase of the trial. (Pet. at 44-48; Pet. Brief at 13-16). In the state trial court, Morrison argued that Morrison's counsel was deficient in his failure to adequately investigate and present evidence in four areas: (1) an alibi defense; (2) the State's timeline; (3) a voluntary intoxication defense; and (4) the victim's relationship with Sandra Brown. The state court granted a new trial based on this claim.

However, the State appealed and, as with the claim in Ground I, the Florida Supreme Court reversed the grant of relief. Morrison Collateral, 236 So. 3d at 217-18. That Court explained as follows:

42

At the postconviction evidentiary hearing, Morrison presented the testimony of Raymond Seels (Morrison's friend), Gilda "Gillis" Payton (Morrison's friend), Austin, and Charlene Wright (Morrison's acquaintance [and Brown's sister]) in support of his alibi defense. These witnesses testified that they saw Morrison in Marietta at or about the time Brown placed Morrison at the scene of the crime. In order to challenge the State's timeline, Morrison presented evidence that Isaia Medina (the victim's neighbor) heard noises "like a chair or piece of furniture being moved" coming from the victim's apartment prior to the murder at approximately 7 p.m. rather than 9 p.m. Morrison presented the testimony of a number of witnesses in support of his voluntary intoxication defense. Austin, Payton, Tangy Allen (Morrison's former fiancée), Turner, Heatly, and Raymond Morrison, Sr. (Morrison's father), collectively testified that Morrison used alcohol and drugs on January 8, 1997, and had a history of alcohol and drug abuse. Dr. Eisenstein diagnosed Morrison with a substance abuse disorder and opined that Morrison's substance abuse compromised his cognitive abilities. Finally, in order to challenge the victim's relationship with Brown, Morrison presented the testimony of Tims and Wright. Tims testified that Brown exchanged sexual favors with the victim in return for beer and cigarettes, and Wright testified that Brown used to buy beer and cigarettes for the victim. [Brown had testified at trial that although she had seen the victim, her neighbor, she did not know his name.]

We conclude that the postconviction court failed to conduct a proper Strickland analysis. As explained previously, the postconviction court found that trial counsel was deficient for failing to adequately investigate an alibi defense, the State's timeline, a voluntary intoxication defense, and the victim's relationship with Brown. The postconviction court only found that trial counsel's failure to present evidence at the guilt phase regarding the voluntary intoxication defense resulted in prejudice. Nevertheless, the postconviction court granted Strickland relief on all four subclaims even though it did not make a finding of Strickland prejudice regarding three of the subclaims. The postconviction court's Strickland analysis also failed to take into

43

consideration Morrison's written statement to the police. As explained previously, the postconviction court erred in granting relief on Morrison's ineffective assistance of counsel claim regarding his written statement to the police.

Regardless, even assuming that trial counsel's investigation was deficient, Morrison has failed to demonstrate prejudice because there is no reasonable probability that the presentation of the alibi witnesses, evidence that Medina heard noises coming from the victim's apartment before the murder, evidence that Morrison used alcohol and drugs on the day of the murder and had a history of alcohol and drug abuse that compromised his cognitive abilities, and evidence that Brown may have had a relationship with the victim would have created a different result at trial. Given the evidence presented at trial, including Morrison's written statement to the police, Morrison cannot demonstrate prejudice such that our confidence in the outcome is undermined.

Accordingly, we reverse the postconviction court's granting of a new guilt phase on this issue.

Id. at 217-18 & n.8 (footnote omitted).

The Florida Supreme Court thus adjudicated this claim on the merits, concluding that it failed on Strickland's prejudice prong. That decision is entitled to deference under § 2254(d). Morrison does not disagree but argues that the decision is contrary to, or an unreasonable application of, clearly established law as determined by the United States Supreme Court under § 2254(d)(1). (Pet. Brief at 14-15; Reply at 11-12). In support, he raises three arguments. None is persuasive.

44

First, Morrison again argues that the Florida Supreme Court employed the wrong prejudice standard under <u>Strickland</u> in evaluating this claim. That is, he asserts that the Florida Supreme Court used an improper "outcome determinative analysis" that asked whether the additional evidence "'<u>would have created a different result at trial</u>,'" rather than the correct standard, which asks just whether there was a "reasonable probability" of a different outcome. (Pet. Brief at 14 (quoting <u>Morrison Collateral</u>, 236 So. 3d at 218) (emphasis in Morrison's Brief)). However, as explained previously, the Florida Supreme Court's opinion quoted and otherwise unambiguously acknowledged the correct formulation for prejudice under <u>Strickland</u> multiple times. So even if a particular sentence in the opinion might not articulate the correct standard, that does not demonstrate that the Florida Supreme Court applied the wrong standard. <u>See</u> <u>Visciotti</u>, 537 U.S. at 22-24. Indeed, the very sentence from the opinion that Morrison quotes in his brief as supposedly articulating the wrong standard is, in fact, consistent with <u>Strickland</u>. That is, the Florida Supreme Court there stated its conclusion that "there is <u>no reasonable probability</u> that [the additional evidence] would have created a different result at trial." (Pet. Brief at 14 (quoting <u>Morrison Collateral</u>, 236 So.3d at 14 (new

45

emphasis added) (emphasis from Morrison's Brief omitted)). This argument is baseless.

In his second argument, Morrison contends that the decision was contrary to and an unreasonable application of Strickland because the Florida Supreme Court allegedly "failed to consider the totality of the evidence." (Pet. Brief at 14-15). However, the Florida Supreme Court expressly stated that its prejudice analysis weighed all the additional evidence that Morrison said counsel should have discovered and presented against "the evidence presented at trial, including Morrison's written statement to police." Morrison Collateral, 236 So. 3d at 218. That is what Strickland commands. See Wong v. Belmontes, 558 U.S. 15, 26 (2009) (recognizing that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice," citing Strickland, 466 U.S., at 695-96). Morrison does not identify any evidence the Florida Supreme Court failed to consider on this issue. In essence, he again just disagrees with that Court's conclusion that he fails to show prejudice under Strickland. This argument is also without merit.

In his third argument, Morrison contends that the Florida Supreme Court's decision "is contrary to the United States Supreme Court's cautionary statement regarding the strength of confessions as independent evidence,"

46

expressed in Escobedo v. Illinois, 378 U.S. 478 (1964). (Pet. Brief at 14-15). In support, Morrison presents a block quotation from Escobedo that includes the following:

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation. …
>
> 'Any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby.'"

378 U.S. at 488-89, quoting 8 Wigmore, Evidence (3d ed. 1940), 309 (alteration adopted).

However, what Escobedo held was simply that police had obtained a confession in violation of his Sixth Amendment right to counsel and due process, and was inadmissible at trial, where police had failed to advise the defendant of his Fifth Amendment right to remain silent and had disregarded his express requests to consult a lawyer during a custodial interrogation. 378 U.S. at 490-92. The broad statements in Escobedo that Morrison quotes do not constitute a holding, or otherwise clearly establish anything, limiting how a reviewing court conducting a prejudice inquiry under Strickland weighs a confession to police and which, as here, is deemed voluntary and admissible at

47

trial. Indeed, the Supreme Court has recognized that "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (quotation marks and citation omitted). Courts thus broadly recognize that the existence of an admissible confession generally makes it more difficult to establish prejudice under Strickland. See, e.g., Premo v. Moore, 562 U.S. 115, 128-32 (2011) (state court was not unreasonable in concluding that petitioner failed to show prejudice based on counsel's failure to move to suppress a confession before advising him to plead guilty, where the existence of a separate, admissible confession supported a finding that petitioner still would have pleaded guilty); Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992) (while "disturbed" by deficiencies in counsel's representation, petitioner failed to show prejudice because "[h]is confession to robbery sealed his conviction for felony murder"); Delap v. Dugger, 890 F.2d 285, 298 (11th Cir. 1989) (failure to bring out inconsistencies in expert's testimony from prior trial did not result in prejudice "in light of the stronger weight that the jury must have placed on the confession"), abrogated on other grounds as recognized in Floyd v. Sec'y, Fla. Dep't of Corr., 638 F. App'x 909, 924 (11th Cir. 2016).

48

Because Morrison fails to show that the Florida Supreme Court's adjudication was contrary to, or unreasonably applied, clearly established law as determined by the United States Supreme Court, habeas relief is denied on Ground II.

### Ground III: The State Allegedly Withheld Favorable Evidence in Violation of Brady

Morrison next asserts that the State violated Brady v. Maryland by failing to disclose to the defense: (1) that crime scene investigators found an unused condom in the pocket of a shirt lying on a chair in the victim's apartment; (2) threatening statements Officer Richardson allegedly made to Sandra Brown, (3) statements that Charlene Wright made to law enforcement; and (4) that when Officer Richardson located and arrested Morrison on the afternoon on January 10, 1997, he allegedly saw Morrison smoking crack cocaine. (Pet. at 50-55; Pet. Brief at 16-21; Reply at 12-16).

Under Brady and its progeny, the government violates due process if it suppresses "evidence that is favorable to the defense and material to the defendant's guilt or punishment." Smith v. Cain, 565 U.S. 73, 75 (2012). Evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "[E]vidence is 'material' within the meaning of Brady when there is a

49

reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009) (citing <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' of a different result" is one in which the suppressed evidence " 'undermines confidence in the outcome of the trial.' " <u>Kyles v. Whitley</u>, 514 U.S. 419, 439 (1995) (quoting <u>Bagley</u>, 473 U.S. at 678). Determining "materiality" requires an assessment of the "cumulative effect" of all favorable suppressed evidence, "considered collectively, not item by item." <u>Id.</u> at 436-37. With these standards in mind, the Court considers each of Morrison's <u>Brady</u> subclaims in turn.

### 1.  The Unused Condom Found in the Victim's Apartment

On the day the victim's body was found, a crime scene investigator wrote in his report that a shirt was observed lying on a chair near the bed in the victim's apartment and that in the pocket of the shirt was an unused condom. Morrison claims the police suppressed this evidence in violation of <u>Brady</u>. (<u>See</u> Pet. at 30-31, 50-52; Pet. Brief at 16-17; Reply at 13-14). He asserts that the condom supported that the victim might have had a sexual relationship with Brown, Morrison's girlfriend who lived in an apartment across from the victim. <u>See</u> <u>Morrison Direct</u>, 818 So. 2d at 438. Brown testified at trial, on the night of

50

the murder, Morrison was visiting her at her apartment until about 9 p.m., when he prepared two steaks and placed them in the oven to cook. Id. He then told Brown he was going to take out the trash, but after leaving, he did not return, and Brown did not see him again until the next day at a different location. Id. On that occasion, Brown indicated, Morrison avoided contact with her, who was attempting to talk to him to find out why he had left so abruptly the previous night. Id. Evidence at trial showed that the victim was killed in his apartment on the night Brown said Morrison had left her apartment and failed to return.

Morrison attempts to link the unused condom found in the victim's apartment to Brown, citing testimony from the postconviction evidentiary hearing that she had turned to prostitution to support herself and kept a bowl of condoms in her apartment that she insisted her "Johns" use. The unused condom found in the victim's apartment, Morrison continues, could have thus impeached Brown's testimony that she knew the victim only very little, undercutting the credibility of her testimony placing Morrison at the scene, as well as potentially suggest Brown's own involvement in the crime. Morrison argues that, at a minimum, the condom indicated that the victim was having

51

sex with someone who might have committed the murder and that the police investigation into such a suspect was deficient.

Morrison raised this Brady claim in his Rule 3.851 motion, and the state trial court rejected it on the merits. (See Doc. 23-58 at 55-57, 61). The Florida Supreme Court affirmed, concluding that Morrison failed to show that "the evidence was either exculpatory or impeaching," and that Court agreed with the trial court that "Morrison failed to present any evidence connecting Brown to the condom." Morrison Collateral, 236 So. 3d at 222-23. The Florida Supreme Court likewise agreed with trial court that Morrison failed "to establish [the victim] planned to have sexual relations with Ms. Brown the night of the murder" and that "[e]ven if Ms. Brown was a prostitute, [Morrison's] ultimate conclusion that a condom in [the victim's] shirt pocket means Ms. Brown killed [the victim] is rank speculation and, thus, does not merit relief." Id. at 223 (bracketed material original).

Morrison argues that the Florida Supreme Court's adjudication is an unreasonable application of clearly established precedent of the United States Supreme Court and rested on an unreasonable determination of the facts under § 2254(d). This Court disagrees. The Florida Supreme Court's opinion

52

identifies <u>Brady</u> as the seminal case, and Morrison does not claim that the opinion articulates any incorrect legal principle under <u>Brady</u> or its progeny.

Morrison also now candidly admits that the "unused condom was not tied to Brown." (Reply at 13). As a result, Morrison retreats to focusing on testimony from the postconviction evidentiary hearing allegedly showing that Brown was engaging in prostitution, that the victim had paid her for sex, that Brown had called the victim her "sugar daddy" and knew him well, and that Brown often carried a blade or box cutter. However, Morrison does not assert that the police were in possession of such information and unlawfully suppressed it. Rather, Morrison's claim is that the police suppressed the presence of the unused condom in the victim's apartment. Without proof connecting that condom to Brown, the condom could not impeach Brown's testimony or suggest her involvement in the murder. The condom does tend to support that the victim was expecting and/or hoping to have sex with some unknown person at some unknown time. Even so, that ambiguous circumstance is not itself exculpatory or material, as it might only hint at the barest possibility that some other unknown subject could have killed the victim. See <u>Maharaj v. Sec'y for Dep't of Corr.</u>, 432 F.3d 1292, 1316 (11th Cir. 2005) (holding that documents in a briefcase the victims brought to the hotel

53

where they were killed were not material, as they "neither impeached [a key witness's] testimony nor called into question any of the physical evidence [against the defendant] …. At most, they arguably cast the victims in a negative light and raise the bare possibility that the [victims] <u>may</u> have been involved in some arguably unsavory activities with other individuals who <u>may</u> have had reasons to do them harm." (emphasis original)); <u>see also</u> <u>Wright v. Sec'y, Fla. Dep't of Corr.</u>, 761 F.3d 1256, 1281 (11th Cir. 2014) ("[A] <u>Brady</u> claim fails when it is only speculative that the materials at issue would have led to exculpatory information.").

Morrison nonetheless insists that the Florida Supreme Court's decision is contrary to or an unreasonable application of <u>Kyles</u>. (Pet Brief at 16-17; Reply at 12-14). Morrison argues that the "existence of the condom, by its very nature, could have been used to attack the reliability of the investigation in failing to consider any other potential perpetrator." (Pet. Brief at 16). "Clearly," he concludes, "the investigation was 'insufficiently probing' as law enforcement conducted no investigation into individuals with whom [the victim] would have been romantically involved." (<u>Id.</u> (quoting <u>Kyles</u>, 514 U.S. at 454).

In <u>Kyles</u>, the defendant was convicted of capital murder in the shooting death of an elderly woman in a grocery store parking lot and then driving off

54

in her car. 514 U.S. at 421-23. The defendant claimed that the government violated Brady by suppressing statements from a witness known as "Beanie," who had contacted police stating that he had heard about the killing and claiming to have bought what he believed might be the victim's car from the defendant. Id. at 423-27. Although Beanie did not testify at trial, the State did not dispute that he had been "essential to its investigation" and "made the case" against the defendant. Id. at 445. However, the Supreme Court recognized that his statements were also "replete with inconsistencies," id.; "would have allowed the jury to infer that Beanie was anxious to see [the defendant] arrested for [the] murder," id.; and were at times even "affirmatively self-incriminating." Id. at 447. Despite that, the police acknowledged that they had never considered Beanie a suspect. Kyles, 514 U.S. at 447. In holding that the defendant was entitled to habeas relief, the Supreme Court of the United States treated Beanie's statements as substantially favorable to the defense in assessing the materiality of all suppressed evidence.[5] Id. at 446-47. That was in part because the defense "could have examined the police to good effect on their knowledge of Beanie's

---

[5] Because Kyles was decided prior to the enactment of AEDPA, the United States Supreme Court reviewed the Brady claim de novo, affording no deference to legal conclusions or mixed determinations of law and fact by the state courts.

55

statements and so have attacked the reliability in failing event to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted [by him]." Id. at 446.

Kyles does thus recognize a general principle that evidence may be material impeachment under Brady based on its potential to impugn the reliability, thoroughness, and good faith of the government's investigation. See also Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1353 nn.20, 21 (11th Cir. 2011). It is also true that the Florida Supreme Court's opinion does not cite Kyles. However, for deference under § 2254(d)(1) to apply, a state court need not cite or even be aware of United States Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Mitchell v. Esparza, 540 U.S. 12, 16 (2003) (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

The Court concludes that the Florida Supreme Court's rejection of this claim is not contrary to, nor does it an unreasonable application of, Kyles. The gulf between Beanie's statements in Kyles and the unused condom found in Morrison's case, in terms of their capacity to undercut the reliability of the government's investigation, is enormous. As the Kyles Court explained, it was

56

Beanie who initially brought the defendant to the attention of police, and the informant's statements could have been interpreted as suggesting he might have planted evidence or perhaps even committed the murder, yet the police never regarded him as a suspect. By contrast, the fact that police found an unused condom in the victim's apartment, never connected to anyone, would have no material tendency to show who killed the victim or why. Thus, the presence of the condom would not, unlike in Kyles, "reveal[] a remarkable attitude on the part of police" regarding "crucial … evidence" in the case. Kyles, 514 U.S. at 445; cf. Grafton v. Davids, No. 2:18-CV-12855, 2020 WL 6130875, at *5 (E.D. Mich. Oct. 19, 2020) (holding that the prosecutor was entitled to argue to the jury that defense counsel's reference in closing arguments to the police's failure to investigate an unused condom found outside the victim's apartment was just a desperate attempt to create reasonable doubt and "a red herring"). Whether habeas review on this claim is under § 2254(d) or de novo, Morrison is not entitled to relief.

### 2. Threats by Officer Richardson to Sandra Brown

Morrison next claims that the State violated Brady by suppressing that Officer Richardson threatened Brown when he questioned her on the day Morrison was arrested. (See Pet. at 32-33, 37, 43, 52-53; Pet. Brief at 18-19;

57

Reply at 14-15). Morrison contends that the defense could have used evidence of the threats to impeach Brown by showing her motivation to provide testimony implicating Morrison. Threats by government agents in securing a witness's testimony may support a Brady claim. See United States v. Scheer, 168 F.3d 445, 452-53 (11th Cir. 1999); see also Giglio v. United States, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of Brady]." (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).

To support this claim, Morrison relies on testimony at the postconviction hearing from two witnesses who lived in Brown's neighborhood, Dolores Tims and Charlene Wright, who was also Brown's sister. Tims testified that, on the day of, but prior to, Morrison's arrest, Officer Richardson approached her and Brown as they conversed outside. She said Richardson took Brown aside and began talking to her but that she, Tims, could still hear their conversation. (Doc. 23-46 at 37-38). Tims testified with regard to what she heard Richardson say to Brown, as follows:

> [Richardson] [s]aid what did I tell you? He say we told you about Raymond [Morrison], but that wasn't for you to go out and say anything to no one about it. ... I didn't tell you to tell you to tell anybody about the cut [on the victim]. ... And he was like I told you

> that I had wanted you just to cooperate and he was like if you don't cooperate and stop telling, you know, what they have gathered, because like he say didn't have enough evidence to arrest no one …. He was just telling her to keep her mouth closed and said what did I tell you, I have you locked up for this here.

(Id. at 38-39). Tims also later testified:

> [Richardson] told [Brown] that … he have her locked up for this case if she didn't cooperate, that means keep her mouth closed because at that time there was no evidence, he said, strong evidence there was no witness, and no one knew about the cut.

(Id. at 47). That prompted Morrison's counsel to follow up further on the nature

of Richardson's threats to Brown:

> Q. And did [Richardson] also make reference to [Brown's] son?
>
> A. He'll take the son. That's what everybody kept saying to [Brown], they'll take the son..
>
> Q. But is that what [Richardson] said to her?
>
> A. Yes.

(Id. at 48).

Tims also further testified about a conversation she later had with Brown about Brown's having testified at Morrison's trial. (See id. at 42-43). Tims related that Brown was friends with Morrison's mother and that "everybody [was] mad at [Brown], against her because she testified against

59

[Morrison]." (Id. at 43). Tims indicated that Brown sought to explain why she had testified, stating as follows:

> She was just more in fear about that this was a couple of things. … And, you know, she didn't have no other choice. …. That police officer [Richardson] threatened to take – take her to jail if she didn't cooperate and take her child from her and that's all she kept saying was her son, she didn't want her son to get taken.

(Doc. 23-46 at 43).

Wright testified at the postconviction hearing that, on the day the victim's body was found, Brown called her and said that police were questioning her and that they were "trying to say that [Morrison] had something to do with it." (Doc. 23-46 at 130). Wright told Brown that she had seen Morrison out the previous night, and Brown relayed that information to the police, which, in turn, prompted them to come take Wright in for an interview. (Id.) Wright subsequently asked Brown why she had involved Wright by giving the police her name. (Id. at 134). According to Wright, Brown responded by claiming "they [were] threatening her to take [her son] away from her and take all of her housing assistance." (Id.)

Morrison contends that the State violated Brady by failing to disclose that Richardson threatened Brown that if she did not "cooperate" she would be "locked up" and have her son taken away. (Pet. at 32). The state trial court

60

denied this claim, (Doc. 23-58 at 57-58, 61), and the Florida Supreme Court affirmed. Morrison Collateral, 236 So. 3d at 223. The Florida Supreme Court acknowledged that "Tims testified at the postconviction hearing that she overheard Officer Richardson threaten Brown to 'cooperate' …." Id. However, the Court credited a determination by the trial court that Tims's testimony indicated that what "cooperate" meant in that context was Brown "following Officer Richardson's instructions not to talk to anyone about the murder." Id. Likewise the Court accepted the trial court's findings that:

> Ms. Tims' testimony illustrates Ms. Brown's fear of consequences if she did not follow Officer Richardson's instructions not to talk to anyone about the murder. It does not show that Officer Richardson threatened Ms. Brown to cooperate when she made her statement …. There is no evidence of Officer Richardson threatening Ms. Brown so as to lead her to testify untruthfully at Morrison's trial.

Id. (alterations adopted).

Morrison argues that "the Florida Supreme Court's determination that the threats by Officer Brown merely encompassed scolding Brown about revealing information about the investigation was unreasonable in light of the evidence presented." (Pet. Brief at 18). Morrison starts by positing that "there was certainly evidence that Brown was threatened." (Pet. Brief at 18-19; see also Reply at 14-15). That much is true. Tims alleged that she heard Richardson tell Brown that he would have her arrested and have her son taken

61

away and suggested that he expected her to "cooperate." Those statements would be a "threat" as the term is commonly understood. See Elonis v. United States, 575 U.S. 723, 733 (2015) (defining "threat" as "[a] communicated intent to inflict harm or loss on another," quoting Black's Law Dictionary 1519 (8th ed. 2004)).

But whether Tims "threatened" Brown is not the issue. The Florida Supreme Court expressly acknowledged that Tims testified "that she overheard Officer Richardson threaten Brown to 'cooperate.'" Morrison Collateral, 236 So. 3d at 223 (emphasis added). It is thus apparent that the Florida Supreme Court's determination that Richardson's statements were not exculpatory or impeaching as required to trigger a disclosure obligation under Brady was not based on whether those statements qualified as "threats." Instead, that Court's conclusion rested on its assessment of what Richardson conveyed when he mentioned an expectation that Brown "cooperate," that is, what action on Brown's part Richardson's statements indicated he was seeking to coerce by means of his alleged threats. On that point, the Florida Supreme Court agreed with the trial court that what Richardson indicated by "cooperate" was Brown not talking to others about the murder and what evidence the police did or did not have, which could compromise the

62

investigation, and <u>not</u> that Brown would face adverse consequences <u>if she did not testify or provide information against Morrison</u>.  <u>See</u> <u>Morrison Collateral</u>, 236 So. 3d at 223.

The Florida Supreme Court's interpretation of the hearing testimony is reasonable, and this Court would agree with it even absent deference. Tims's testified that she heard Officer Richardson threaten Brown if she didn't "cooperate." In isolation, that could potentially suggest a demand or expectation that Brown help the police generally, including potentially by providing testimony. <u>See generally</u> Cooperation, Oxford English Dictionary (revised 2022) (defined as "[t]he action or practice of working together, or with another or others, towards the same end, purpose, or effect; collaboration; joint operation. Also: compliance with an authority, order, request, etc.; willingness to be of assistance."); <u>see also</u> <u>Scheer</u>, 168 F.3d at 458 (evidence that prosecutor "intimated that [witness's] failure to testify in a 'cooperative' fashion might result in his return to prison, was material information that might have substantially undermined the critical value of [the witness's] testimony"). However, Tims made clear that she understood Richardson to have been upbraiding Brown specifically about sharing information that Richardson had told Brown about how the murder occurred and the police investigation. That

63

is, Tims said Richardson "told her that he ... [would] he have her locked up ... if she didn't cooperate, that means keep her mouth closed." (Doc. 23-46 at 47 (emphasis added)); see also id. at 38-39 ("He was just telling [Brown] to keep her mouth closed." (emphasis added)). Indeed, the Petition itself alleges that "Tims overhead Richardson chastising Brown for telling others how the victim was killed." (Pet. at 33 (citing Doc. 23-46 at 39-40)). By contrast, Morrison fails to reference any testimony whereby Tims or anyone else claims to have heard Richardson or any other government agent mention anything about the prospect of Brown testifying or providing information against Morrison or that she would face consequences if she didn't.

Morrison does not truly contest that point. Instead, he highlights that Tims also testified that Brown said that she had testified at trial against Morrison because Richardson had "threatened to take ... her to jail [and take her child] if she didn't cooperate." (Doc. 23-46 at 43). Morrison likewise points to Wright's testimony that Brown had said she had given Wright's name to police because "they [were] threatening her to take [Brown's son] away from her and take all of her housing assistance." (Id. at 134). But, again, while Tims claims she overheard Richardson's conversation with Brown, Tims only says she heard Richardson threaten Brown over her sharing information about the

64

crime and the investigation with third parties, not over giving testimony or information to benefit the prosecution. And Wright does not claim to have heard any threats to Brown. Further, to the extent Morrison relies on Tims and Wright's testimony to establish the substance of threats that Richardson allegedly made to Brown, not heard by Tims or Wright, Tims and Wright's testimony would be hearsay that the Florida courts might decline to credit. See Fla. Stat. §§ 90.801, 90.802; Pittman v. Sec'y, Fla. Dep't of Corr., 871 F.3d 1231, 1248-49 (11th Cir. 2017).

Moreover, Tims and Wright's cited testimony does not support that Brown told them that Richardson did, in fact, threaten her with adverse action if she did not testify at Morrison's trial. Instead, what Tims and Wright claimed was that Brown said that she testified at trial and gave Wright's name to police because Brown was afraid that if she didn't so "cooperate," the police would arrest her, take away her son, and/or take away her housing assistance.[6]

---

[6] Morrison asserts that, "following Morrison's conviction and sentence, Brown confessed that she had lied at the trial and that she only testified against Morrison because she had been threatened about losing her son." (Pet. at 37 (citing Doc. 43-26 at 43). However, the allegation that Brown admitted to lying on the stand is wholly unsupported. The language in the Petition seems calculated to convey an impression that Brown testified at the postconviction hearing and admitted to giving false testimony at trial. She did not. Brown did not testify at the postconviction proceedings at all. Rather, for the proposition that Brown "confessed" to giving false testimony, Morrison relies on Tims's postconviction testimony. Even so, nowhere on the cited

65

Even if Brown might have thought that, however, her subjective belief that the government might retaliate if she didn't testify does not itself establish that Richardson actually made such a threat that had to be disclosed under Brady or Giglio. See United States v. Boroughs, 830 F.2d 1574, 1579 (11th Cir. 1987) (recognizing that letter from witness to the defendant's sister stating that he did not want to testify against the defendant but that the witness could not let his wife go to jail and have their children put in a state home did not "necessarily support[] the conclusion that the government affirmatively threatened to remove [the witness's] children from their home"). That is also supported by caselaw recognizing that the fact that a witnesses or their counsel acknowledges a subjective hope or expectation that giving testimony would result in favorable treatment from the government, as on a pending charge, does not establish the existence of an agreement or understanding with the government for favorable treatment that must be disclosed under Brady or Giglio. See Tarver v. Hopper, 169 F.3d 710, 716-17 (11th Cir. 1999); Mills v.

_____

page of the record does Tims allege that Brown admitted that her trial testimony was false. To the contrary, the transcript shows that Morrison's counsel sought to inquire into that very subject with Tims, but the trial court sustained the State's hearsay objection, precluding an answer. (Doc. 23-46 at 43-44). See also Morrison Collateral, 236 So. 3d at 224-25 (rejecting that Brown's alleged posttrial admission to Tims was newly discovered evidence entitling Morrison to a new trial, recognizing that "there is no evidence that Ms. Brown's trial testimony was untruthful").

66

Singletary, 63 F.3d 999, 1018 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1555 (11th Cir. 1994); Depree v. Thomas, 946 F.2d 784, 797-98 (11th Cir. 1991); McClesky v. Kemp, 753 F.2d 877, 883-84 (11th Cir. 1985) (en banc), aff'd on other grounds, 481 U.S. 279 (1987); Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir. 1983); see also Rodriguez v. Sec'y, Fla. Dep't of Corr., 756 F.3d 1277, 1306-07 (11th Cir. 2014) (even if detectives were subjectively motivated to allow a witness to have family visits and a conjugal visit with his wife while in jail to help ensure his testimony, the fact of such motivation was not material under Giglio or Brady where "[a]ll [the witness] knew was that the detectives were accommodating his requests for family visits" and it was "clear … that the visits were not … the quid pro quo for his testimony"). Thus, a Brady claim cannot be founded upon the suppression of "subjective information existing only in the mind of a witness." Boroughs, 830 F.2d at 1579 n.6.

Finally, Morrison falls back to argue, in essence, that whatever Richardson threatened Brown about, it had to be disclosed under Brady and Giglio. However, the "thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony." Hammond v. Hall, 586 F.3d 1289, 1317 (11th Cir. 2009) (quoting Alderman, 22 F.3d at 1554) (emphasis added). Thus, "not everything said to a witness …

67

must be disclosed. … Some promises, agreements, or understandings do not need to be disclosed, because they are too ambiguous, or too loose or of too marginal a benefit to the witness to count." United States v. Curtis, 380 F.3d 1311, 1316 n.7 (11th Cir. 2004) (quoting Tarver, 169 F.3d at 717); see also Alderman, 22 F.3d at 1555 ("The rule [of Giglio] does not address nor require the disclosure of all factors which may motivate a witness to cooperate."). For example, a detective's promise to "speak a word" to the prosecutor on the witness's behalf does not need to be disclosed. See McCleskey, 753 F.2d at 884. Nor does a prosecutor's statement that he would "take care" of the witness. See Depree, 946 F.2d at 797-98.

Morrison cites no Supreme Court case clearly establishing that threats similar those that Officer Richardson allegedly made to Brown had to be disclosed under Brady. Again, Tims did not claim to have heard Richardson mention or even allude to Brown being required to provide information or testimony against Morrison. Rather, Tims indicated that Richardson's statements were calculated to coerce Brown specifically to stop talking to others about the facts of the crime and the investigation. As such, the Florida Supreme Court would not have been unreasonable for purposes of § 2254(d)(1) to treat Richardson's statements as too vague, ambiguous, and/or unconnected

68

to Brown giving testimony at trial such that the failure to disclose the alleged threats did not violate due process. See Rodriguez, 756 F.3d at 1306-07; Tarver, 169 F.3d at 717; McCleskey, 753 F.2d at 884; Depree, 946 F.2d at 797-98. Whether habeas review is under § 2254(d) or de novo, Morrison is not entitled to relief on this claim.

### 3. Charlene Wright's Statement and Morrison's Drug Use When Arrested

Morrison next raises two claims that are related in that the Florida Supreme Court rejected both on the same basis, namely, that a "Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant." Morrison Collateral, 236 So. 3d at 223 (quoting Ochhino v. State, 768 So. 3d 1037, 1042 (Fla. 2000)). First, Morrison claims that the government suppressed statements that Charlene Wright made to police the day after the murder that she had seen Morrison out in Jacksonville's Marietta neighborhood between 8 and 9 p.m. on the night of the murder. That is contrary to Brown's trial testimony that Morrison was with her at her apartment at that time, placing him near the scene shortly before the State theorized that the victim was killed. (Pet. at 24 n.9, 34-35, 53-55 (citing Doc. 23-46 at 130-33); Pet. Brief at 19-21). According to Wright's

69

testimony at the postconviction hearing, she had seen Morrison about a block away in the neighborhood; she waved to him and yelled, "Hey"; and he replied "Hey" back and kept walking. (Pet. at 35). Wright also told police that she saw no blood on Morrison. (Id.) Morrison argues that Wright's statement supported an alibi defense and had to be disclosed under Brady. The Florida Supreme Court rejected the claim because it concluded that Wright's testimony showed that Morrison would have known that they had seen each other and exchanged salutations. Morrison Collateral, 236 So. 3d at 223.

Morrison also claims that the government suppressed that Officer Richardson saw Morrison smoking crack cocaine when Richardson found him in a trailer and arrested him. (Pet. 36, 55 (citing Doc. 23-46 at 29, 41, 48); Pet. Brief at 19-21). Morrison argues that information had to be disclosed under Brady because it would have supported that his statements during his ensuing police interrogation were compromised by drug use, and not knowing and voluntary, and thus due to be suppressed. The Florida Supreme Court rejected the claim because it concluded the government did not suppress the information because Morrison would have known of his own drug use. Morrison Collateral, 236 So. 3d at 223.

70

Morrison contends that the Florida Supreme Court's adjudication of both claims is contrary to, or unreasonably applied, clearly established United States Supreme Court precedent under § 2254(d)(1). (Pet. Brief at 19-20). Specifically, he relies on Brady itself, as well as Banks v. Dretke, 540 U.S. 668 (2004). In Brady, the state charged two co-defendants, Brady and Boblit, with capital murder, for a killing that occurred during a robbery. 373 U.S. at 84. Brady was tried first and took the stand, admitting his participation in the robbery but claiming Boblit killed the victim. Id. Brady was nonetheless sentenced to death. Id. The Supreme Court held that the government violated due process by failing to disclose that Boblit had previously confessed to police that he had killed the victim, which the Court concluded might have led Brady to receive a sentence less than death. Id. at 84-91.

The defendant in Banks was also convicted of capital murder. 540 U.S. at 674-75. Despite telling the defense that it would automatically disclose any Brady evidence, the government failed to disclose that a key prosecution witness was a paid police informant. See id. at 675-78. In addressing the whether the defendant could show "cause" excusing his failure to present evidence in state court to support a related Brady claim, the Banks Court considered an argument by the state that the defendant had failed to exercise

71

"appropriate diligence" to "attempt to locate [the witness]" or to "investigate the investigating officers" in order "to ascertain [the witness's] status [as an informant]." Id. at 695-96. The Court began by noting that it had rejected a similar argument several terms earlier in Strickler, wherein the state had asserted, despite claiming to have "open file" discovery, that "examination of a witness' trial testimony, alongside a letter the witness published in a local newspaper, should have alerted the petitioner to the existence of undisclosed interviews of the witness by police." Banks, 540 U.S. at 695 (citing Strickler, 527 U.S. at 284 & n.26). The Court then rejected the state's argument in Banks, which the Court cast as urging, "in effect, that the prosecution can lie and conceal and the prisoner still has the burden to discover the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected." Id. at 696 (citations, internal quotation marks, and ellipses omitted). The Court concluded, "A rule thus declaring, 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." Id.

Morrison's claim based on his drug use at the time of his arrest is the simpler one to analyze. Courts have long recognized that "[e]ven undisclosed favorable and material information in the possession of the government is not

72

'suppressed' in violation of <u>Brady</u> if the defendant knew of it." 6 Wayne R. LaFave, et al., Crim. Proc. § 24.3(b) (5th ed. Nov. 2025 Update) ("LaFave"); <u>see also</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995); <u>United States v. Augurs</u>, 427 U.S. 97, 103 (1976) (both generally characterizing <u>Brady</u> claims as involving evidence known to the prosecution but "unknown to the defense"); <u>Boyd v. Comm'r, Ala. Dep't of Corr.</u>, 697 F.3d 1320, 1334 (11th Cir. 2012) ("Evidence is not considered to have been suppressed if 'the evidence itself proves that the petitioner was aware of the existence of that evidence before trial.'" (quoting <u>Felker v. Thomas</u>, 52 F.3d 907, 910 (11th Cir. 1995) (ellipses omitted, alteration adopted)). Nothing in <u>Brady</u> or <u>Banks</u> is to the contrary, as there was no claim or indication that the defendant or his counsel in either case had actual knowledge of the information withheld, namely, the co-defendant's confession and the witness's status as a paid informant, respectively. By contrast, Morrison would have known of his own drug use. <u>See</u> <u>Boyd</u>, 697 F.3d at 1335 (defendant could not show "suppression" of his own statements to police because he "was obviously present during this questioning and thus aware of anything he may have said").

Failing to dispute that point, Morrison instead claims that what "he did not know" was that "<u>Tims heard Officer Richardson confirm</u> that Morrison

73

used drugs just before he was arrested." (Pet. Brief at 20 (emphasis added)). That attempt to move the goal posts is unavailing. Morrison's claim as pled is that "Richardson did not report Morrison's use of crack though it was relevant to the suppression issue" (Pet. at 55; see also id. at 36), not that the State suppressed the fact that Tims heard Richardson make a statement about Morrison's drug use. Morrison's claim in state court was also based on the suppression of his drug use itself. (See Doc. 23-39 at 28, ¶ 18). Accordingly, any distinct claim based on an alleged suppression of the fact that Tims heard Richardson's remark about Morrison's drug use is procedurally defaulted.

Such a claim would also fail on the merits. At the hearing on Morrison's motion to suppress his statements to police, Morrison did claim that he had previously used drugs and alcohol, and, again, he would have generally been aware of if, when, and to what extent he had taken drugs prior to the interrogation. The State also presented substantial testimony from the law enforcement officers addressing Morrison's appearance, demeanor, and manifested ability to comprehend during the interrogation. Morrison fails to show a reasonable probability that disclosure of the additional fact that Tims heard a remark by Richardson acknowledging Morrison had smoked some unspecified quantity of drugs at the time of his arrest would have resulted in

74

state court granting Morrison's motion to suppress or in a different outcome at trial. Morrison is not entitled to habeas relief on any Brady claim based on the failure to disclose information related to his own drug use at the time of his arrest.

Morrison's claim based on the failure to disclose information related to Wright's statement is less straightforward. The Florida Supreme Court also found no suppression on this claim, on the basis that Morrison "knew of the evidence alleged withheld or had possession of it" because "no one was in a better position to know if Wright saw and talked with Morrison in Marietta on the night of the murder than Morrison himself." Morrison Collateral, 236 So. 3d at 223. Morrison argues, however, that the suppression was not of the fact that he and Wright had seen each other and spoken, which he might have known, but, rather, that Wright had given a statement to law enforcement confirming as much, which he didn't. Morrison claims that the statement was exculpatory because it supported his alibi and is akin to the co-defendant's confession tending to exculpate the defendant in Brady. Morrison further suggests that Banks precludes that a prisoner might have "the burden to discover the evidence, so long as the potential existence of a prosecutorial

75

misconduct claim might have been detected." (Pet. Brief at 20 (quoting <u>Banks</u>, 540 U.S. 696 (ellipses and internal quotation marks omitted)).

It is true that the <u>Brady</u> Court treated the substantive fact that the co-defendant, Boblit, had killed the victim as distinct from the fact that Boblit had confessed that to police. The defendant, Brady, did not know about the confession. However, he and Boblit had committed the robbery together, and Brady testified at trial to having seen Boblit kill the victim. Thus, as to underlying events, the <u>Brady</u> Court would not have been wrong to recognize, similar to the Florida Supreme Court in Morrison's case, that "no one was in a better position to know if Boblit killed the victim than Brady himself." Nor did the United States Supreme Court hint that Brady might have had some obligation to himself learn of the confession or to extract similar evidence from Boblit. Rather, the Court granted relief, holding that the government had suppressed the confession in violation of due process. Similarly, the Supreme Court has more recently held that the government's failure to disclose prior out-of-court statements by an eyewitness that would have impeached his in-court identification of the defendant violated <u>Brady</u>. <u>See</u> <u>Smith v. Cain</u>, 565 U.S. 73, 75-76 (2012).

76

Many federal courts of appeals have also agreed with Morrison's suggestion that Banks, as well as Strickler, generally support at least a limitation on any broad principle that evidence is not "suppressed" for Brady purposes whenever the defense could have, in the exercise of reasonable diligence, discovered the existence of the evidence and obtained it independently. See Fontenot v. Crow, 4 F.4th 982, 1066 (10th Cir. 2021); Amado v. Gonzalez, 758 F.3d 1119, 1136-37 (9th Cir. 2014); Dennis v. Secretary, 834 F.3d 263, 290-91 (3d Cir. 2016) (en banc); United States v. Tavera, 719 F.3d 705, 712 (6th Cir. 2013); see also LaFave, § 24.3(b) n. 82; K. Weisburd, Prosecutors Hide, Defendants Seek: The Erosion of Brady Through the Defendant Due Diligence Rule, 60 UCLA L.Rev. 138 (2012); also cf. Glossip v. Oklahoma, 604 U.S. 226, 252 (2025) (holding that prosecution violated Napue v. Illinois, 360 U.S. 264 (1959), by failing to correct false testimony from key co-defendant witness; rejecting state court's rationale that claim was due to be denied because defendant "was aware or should have been aware" of information indicating the falsity of the testimony)[7].

---

[7] Only holdings of Supreme Court precedents existing at the time of the state court's decision can clearly establish federal law for purposes of § 2254(d)(1). Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Glossip does not qualify. It addresses a Napue claim, also often called a Giglio claim, based on the prosecution's knowing failure to

77

All that said, the Supreme Court of the United States has not clearly established that the government violates <u>Brady</u> where, as here, it fails to-disclose a witness's non-self-inculpatory, out-of-court statement where the defendant would have known the witness's identity and the information they possessed and therefore could have sought exculpatory evidence directly from the witness. Many courts, including the Eleventh Circuit, continue to apply a due diligence requirement to <u>Brady</u> claims. <u>See</u> <u>United States v. Defilippis</u>, No. 21-13123, ___ F.4th ___, ___, 2026 WL 1067115, at *10 (11th Cir. Apr. 20, 2026); <u>United States v. Laines</u>, 69 F.4th 1221, 1231-32 (11th Cir. 2023); <u>Maharaj</u>, 432 F.3d at 1315 & n.4; <u>United States v. Therrien</u>, 847 F.3d 9, 16 (1st Cir. 2017); <u>Guidry v. Lumpkin</u>, 2 F.4th 472, 487 (5th Cir. 2021); <u>United States v. Anwar</u>, 880 F.3d 958, 969 (8th Cir. 2018). Indeed, "Federal courts as of 2025 were about evenly split" on whether the government suppresses evidence under <u>Brady</u> "if the defendant … could have obtained [the evidence withheld]

_____

correct false trial testimony. A <u>Brady</u> claim, based on the prosecution's failure to disclose favorable evidence, regardless of whether the state presents false evidence at trial, is related but distinct. <u>See</u> <u>United States v. Stein</u>, 846 F.3d 1135, 1147 (11th Cir. 2017). The question of whether and to what extent the defense's actual or constructive knowledge of the falsity of a witness's testimony impacts the viability of a <u>Napue/Giglio</u> claim "resembles somewhat the debate over whether defendants must exercise due diligence under <u>Brady</u>." LaFave, § 24.3(d), text and nn.29 & 30. Nevertheless, <u>Glossip</u> is not a holding directly on point. More obviously, <u>Glossip</u> was decided in 2025, years after the Florida Supreme Court denied Morrison's collateral appeal.

78

with reasonable effort. State courts too disagree." LaFave, § 24.3(b) (footnotes omitted). To the point here, the Eleventh Circuit has held in several cases that no suppression occurred specifically where the defendant would have known of the witness's identity and the favorable information they possessed, such that the defense reasonably could have interviewed and sought to call the witness. See Jennings v. McDonough, 490 F.3d 1230, 1238-39 & n.8 (11th Cir. 2007); Felker, 52 F.3d at 910; United States v. Griggs, 713 F.2d 672, 674 (11th Cir. 1983); see also McNeill v. Bagley, 10 F.4th 588, 600 (6th Cir. 2021); United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004). As such, the Florida Supreme Court's rejection of this claim is not contrary to, or an unreasonable application of clearly established law as determined by then-existing United States Supreme Court precedent. This claim is denied.

### 4. Detective Davis's Handwritten Notes

In his final Brady claim, Morrison contends that the State suppressed "handwritten notes" taken by Detective Davis. (Pet. at 33-34; see also id. at 45-46). Morrison alleges that those notes included a letter "S" written by Brown's name, indicating police considered her a "suspect," as well as "impressions of [her] demeanor" and that Davis told her it was her "last chance to tell the truth." Morrison asserts that the notes also memorialized statements by

79

another witness, Isaia Medina, who was staying in the apartment below that of the victim. Medina, Morrison alleges, claimed to have heard noises, which sounded like a chair or a piece of furniture being moved, coming from the victim's apartment sometime between 8:30 and 9:00 p.m. on the night of the murder. Morrison says that differs from the written police report disclosed to the defense, which allegedly indicated Medina had specified only the 9:00 p.m. time.

Morrison raised a claim based on these allegations in the Florida Supreme Court. (Doc. 23-61 at 33-34, 124-25). It rejected the claim as procedurally barred, concluding that Morrison had not raised it in the state trial court. Morrison Collateral, 236 So. 2d at 223. As a result, the State argues, the claim is unexhausted and procedurally defaulted on federal habeas review. (Response at 47-48). Morrison insists, however, that he did raise the claim in the state trial court, citing a page of his amended Rule 3.851 motion filed in March 2014. (Pet. Brief at 19, citing PC-R. 860-1 (Doc. 23-39 at 27)). He contends that he there pleaded "the inconsistencies in Detective Davis' notes" (id.), which he says were "the specifics" of the claim. (Reply at 15-16). The State disputes that Morrison raised the claim in the lower court, arguing that

"pleading inconsistencies is vastly different from asserting that, in violation of Brady, the State failed to disclose Detective Davis's notes." (Response at 48).

A "federal habeas claim may not be reviewed on the merits where a state court determined ... that the petitioner failed to comply with an independent and adequate state procedural rule that is regularly followed." Philmore v. McNeil, 575 F.3d 1251, 1260 (11th Cir. 2009). Accordingly, even if technically exhausted, this claim might be procedurally defaulted because the Florida Supreme Court held it was barred because Morrison had not raised it in the state trial court. See Shinn v. Ramirez, 596 U.S. 366, 378 (2022).

The Eleventh Circuit has established a three-part test to assess whether a state court's procedural ruling constitutes an independent and adequate state rule of decision barring review of a federal claim. See Ward v. Hall, 592 F.3d 1144, 1156-57 (11th Cir. 2010)  "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." Id. at 1156 (quoting Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." Id. at 1156-57. "Third, the state procedural rule must be adequate, i.e., firmly

81

established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" Id. at 1157 (quoting Judd, 250 F.3d at 1313); see also Boyd, 697 F.3d at 1336 ("The state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim to be considered adequate ...." (quoting Card v. Dugger, 911 F.2d 1494, 1517 (11th Cir. 1990)).

The Florida Supreme Court clearly and expressly relied on an independent state procedural rule to bar this claim, namely, that he had not raised the claim below. See Morrison Collateral, 236 So. 3d at 223. That rule is firmly established and regularly followed in the Florida state courts. See Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1338 (11th Cir. 2009). Morrison does not argue otherwise. Rather, he contends only that "the Florida Supreme Court's determination that [his] claim[] related to Detective Davis'[s] notes is procedurally barred is rebutted by clear and convincing evidence," because, Morrison says, he did plead the claim in his amended Rule 3.851 motion. (Pet. Brief at 19).

Morrison thus appears to invoke 28 U.S.C. § 2254(e)(1), which recognizes that a state court's "determination of a factual issue" is presumed correct and that the petitioner has "the burden of rebutting [that] presumption ... by clear

82

and convincing evidence." However, that provision applies only to pure findings of fact, not legal conclusions or mixed determinations of fact and law. Tanzi v. Sec'y Fla. Dep't of Corr., 772 F.3d 644, 651 (11th Cir. 2014). There is no dispute here about what Morrison's amended Rule 3.851 motion says; that pleading is in the record. The only question, rather, is whether the pleading's substantive allegations were legally effective to raise this claim. Accordingly, the Florida Supreme Court's determination that Morrison did not raise the claim below is based at least partially on a conclusion of law, to which § 2254(e)(1) would not apply. See id. ("When considering a determination of a mixed question of law and fact, … the statutory presumption of correctness applies only to the underlying factual determinations."). Rather, the issue properly framed is whether the Florida Supreme Court's application of a state-law procedural bar for failure to raise the claim below was "arbitrary or unprecedented" considering the substance of the amended Rule 3.851 motion cited by Morrison. See Thomas v. Att'y Gen., 992 F.3d 1162, 1185-86 (11th Cir. 2021) (upholding district court's finding that claims were procedurally defaulted based on Florida Supreme Court's adjudication that claims were procedurally barred for failure to raise them on direct appeal or in amended

83

postconviction motion and "those procedural bars were regularly imposed and not applied arbitrarily.")

Florida law requires a prisoner sentenced to death seeking postconviction relief under Rule 3.851 to plead "a detailed allegation of the factual basis for any claim…." Fla. R. Crim. P. 3.851(e)(1)(D), (E); see also Hunter v. State, 29 So. 3d 256, 261, 268 (Fla. 2008); Gonzalez v. State, 990 So. 2d 1017, 1034 (Fla. 2008). To support that he raised a Brady claim based on the suppression of Detective Davis's handwritten notes in the state trial court, Morrison cites a single page of his amended Rule 3.851 motion. (See Doc. 23-39 at 27). It appears within a section of that pleading proceeding under a banner asserting claims based on combined or alternative theories under Brady, Giglio, and/or Strickland. (Id. at 22). The page does contain allegations about Brown, including that her trial testimony placing Morrison at her apartment until about 9 p.m. was "in conflict" with her having "originally told law enforcement that [he] was not present" and that "she denied knowing anything about the crime." (Id. at 27, ¶¶ 15, 16). However, Morrison does not assert in his federal habeas petition that the State failed to disclose that Brown initially told police that Morrison had not been at her apartment or that she denied having relevant information. The Rule 3.851 motion also pleads

84

generally that, in the two days following discovery of the victim's body, Brown's "behavior … was suspicious," and that Detective Davis interviewed her and described her as "very defensive" and "unspecific," adding that he "believed that Brown knew more than she was telling them." (Id. at 27, ¶ 16). But again, the motion does not specifically allege that the police suppressed, concealed, or failed to disclose that information, and he does not claim here that the police suppressed that Brown initially told them she did not know anything about the crime. Most conspicuously, the cited page of the Rule 3.851 motion does not mention anything about "notes," "handwritten" or otherwise, from Detective Davis or anyone else, nor anything about Medina or his statement about hearing noises in the victim's apartment. Finally, the motion also fails to allege that the police considered Brown a "suspect" in the murder and failed to disclose it. Considering the allegations of Morrison's amended Rule 3.851 motion, the Florida Supreme Court's determination that it did not contain a Brady claim based on the suppression of Detective Davis's handwritten notes was not arbitrary or unprecedented as to render the state procedural bar inadequate. Therefore, this claim is procedurally defaulted. See Ray v. Thomas, No. CIV.A. 11-0543-WS-N, 2013 WL 5423816, at *36 (S.D. Ala. Sept. 27, 2013) (state appellate court's procedural bar of claim based on petitioner's

85

failure to raise the claim in postconviction motion was adequate and independent state law ground; rejecting petitioner's theory that the state appellate court had "misapprehended" his postconviction motion), aff'd sub nom. Ray v. Alabama Dep't of Corr., 809 F.3d 1202 (11th Cir. 2016). Habeas relief is denied on all claims in Ground III.[8]

### Ground IV: Law Enforcement Allegedly Coerced Morrison's Statements by Exploiting his Religious Beliefs

As discussed previously, defense counsel moved to suppress Morrison's statements to law enforcement, including his written statement (Doc. 23-3), as well as related physical evidence. (Doc. 23-4). In Ground I of the Petition, Morrison claimed that his counsel was ineffective for failing to adequately argue and present evidence in support of the motions to suppress. Here in Ground IV, he raises a related, independent claim asserting that the trial court erred to the extent it denied the motions to suppress. Specifically, Morrison contends that his statements to Detective Short, including his written statement, were involuntary because law enforcement "exploit[ed]" Morrison's "sincerely felt religious beliefs and anxieties." (Pet. at 56). As such, Morrison

---

[8] Morrison does not include a discussion attempting to establish materiality under Brady based on the cumulative effect of all of the evidence allegedly wrongfully suppressed. See Kyles, 514 U.S. at 436-37. The Court concludes, however, that Morrison also cannot establish materiality on that basis.

86

argues, his statements were coerced and should have been suppressed under the Fifth and Fourteenth Amendments because Richardson and Short made explicit, improper appeals to religion in an effort to convince Morrison to confess to the murder. (Id. at 56-57; Pet. Brief at 21-24); (see also Doc. 23-30 at 82-108); Morrison Direct, 818 So. 2d at 438; id. at 458-60 (Quince, J., concurring in the result).

The State argues this claim is due to be denied as unexhausted and procedurally defaulted because, the State asserts, the Florida Supreme Court rejected the claim on direct appeal on that ground that Morrison had failed to properly raise it in the trial court. (Resp. at 50-53). The State relies on the Florida Supreme Court's per curiam opinion on direct appeal, which concluded that Morrison was "foreclosed" from raising this claim on appeal because he "did not argue the point he now raises below," based on the fact that he had testified at the suppression hearing "that he did not make any inculpatory statements to police." Morrison Direct, 818 So. 2d at 446 (emphasis original) (citing Archer v. State, 613 So. 2d 446, 448 (Fla. 1993); Woods v. State, 733 So. 2d 980, 984 (Fla. 1999); Tillman v. State, 471 So. 2d 32, 35 (Fla. 1985); and Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982)). The State maintains that the Florida Supreme Court thus clearly and expressly relied on state-law

87

procedural rule to dispose of the claim. Morrison responds the Florida Supreme Court's decision "was based on an unreasonable determination of the facts" because he did raise the issue in the state trial court, and that the decision improperly "rests on the testimony that Morrison gave when he was cross-examined" at the suppression hearing, which was not even asserted by the State as creating a procedural bar on appeal. (Pet. Brief at 22-24).

However, there is an analytically prior issue. Specifically, the per curiam opinion cited by the State was joined by only three of the seven members of the Florida Supreme Court, see Morrison Direct, 818 So. 2d at 458, but a binding decision requires four or more votes. See Santos v. State, 629 So. 2d 838, 840 (Fla. 1994); Greene v. Massey, 706 F.2d 548, 551-52 (11th Cir. 1983). Accordingly, at least one additional member of the Florida Supreme Court must have clearly and expressly stated that that this claim was procedurally barred on appeal under state law before the claim might be deemed unexhausted and procedurally defaulted on federal habeas review. See Ruiz v. Quarterman, 504 F.3d 523, 527-28 (5th Cir. 2007); see also Tennard v. Dretke, 542 U.S. 274, 286 n.* (2004) (recognizing that, on federal habeas review, conclusion of four-judge plurality opinion of Texas Court of Criminal Appeals was not controlling; rather, the narrower decision of a concurring judge was);

88

Clark v. Dugger, 901 F.2d 908, 914 n.4 (11th Cir. 1990) ("[W]e accept the plain meaning expressed by the majority of the Florida Supreme Court in its decision [when deciding if it applied a state-law procedural bar]"). However, no other member of the Florida Supreme Court did so, as further explained below.

The four justices who did not join the per curiam opinion "concur[red] in the result only." Morrison Direct, 818 So. 2d at 458. That itself signals that they did not necessarily agree with the reasoning of the per curiam opinion. See "Concur," Black's Law Dictionary (6th ed. 1990) (defining as agreement "with the result reached by another, but not necessarily with the reasoning or the logic used in reaching such a result" and describing "concurring opinion"). Justice Quince authored a concurring opinion, joined by two other justices, which addressed only this claim. Id. at 458-60 (Quince, J., concurring in the result). Her opinion began:

> While I believe that under the unique facts of this case, the trial court did not err in denying the motion to suppress Morrison's statements to Officer Short and his confession, I write to express my concern about the interrogation techniques used by the police in this case and particularly the use of an officer who is a minister in interrogating the defendant.

Id. at 458 (Quince, J., concurring in the result) (footnote omitted) (emphasis added). That language itself indicates that she would deny the claim on the merits, i.e., based on the substantive correctness vel non of the trial court's

89

ruling. See Johnson v. Williams, 568 U.S. 289, 302 (2013) (recognizing that a court has rendered a judgment "on the merits" for purposes of § 2254(d) when it has "heard and evaluated the evidence and the parties' substantive arguments" (emphasis original)). Justice Quince also discussed the hearing testimony and facts underlying the claim at some length, and her only cited legal authorities were Oregon v. Elstad, 470 U.S. 298 (1985), and Davis v. North Carolina, 384 U.S. 737 (1966), Supreme Court decisions related to the substance of the federal claim. See Morrison Direct, 818 So. 2d at 458-59 (Quince, J., concurring in the result). She did acknowledge in passing that Morrison had testified at the hearing that he had not made any verbal confessions during the interrogation. Id. at 459 (Quince, J., concurring in the result). However, she did not state that that or any other circumstance gave rise to a procedural bar, that Morrison was foreclosed from raising the claim on appeal, or that it was otherwise unnecessary or improper to consider the merits. At a minimum, Justice Quince's concurring opinion does not clearly and expressly rely on a state procedural rule to reject the claim. The remaining member of the Florida Supreme Court, Justice Anstead, also voted to concur in the result only, and he did not author or join any opinion. Id. at 458.

Because the Florida Supreme Court did not clearly and expressly rely

upon a state-law procedural rule to deny this claim, it is not procedurally

defaulted on federal habeas review.[9] See Ruiz, 504 F.3d at 527-28. Rather, the

Court presumes that the majority of the justices rejected the claim on the

merits, and its decision is entitled to deference under § 2254(d). See Richter,

562 U.S. at 99.

While the claim is not procedurally defaulted, Florida Supreme Court's

rejection of the claim is not contrary to, or an unreasonable application of

clearly established precedent of the Supreme Court of the United States, nor

is the decision based on an unreasonable determination of the facts under 28

U.S.C. § 2254(d). Appeals by law enforcement to a suspect's religious beliefs,

---

[9] The Court would also note that it agrees with Morrison that he did, in fact, clearly and unambiguously argue to the state trial court that his statements to police were due to be suppressed because of law enforcement made improper appeals to his religious beliefs. (See Doc. 3 at 6-7; Doc. 10 at 3, ¶ 3; id. at 27). Further, while the Florida Supreme Court's per curiam opinion would have held this claim procedurally barred on the basis that Morrison personally denied making any inculpatory statements to police, the Supreme Court of the United States has held that a defendant is entitled to contest the admissibility of an alleged confession as involuntary notwithstanding that the defendant denies making the confession. See Lee v. Mississippi, 332 U.S. 742, 745 (1948); Ashcraft v. Tennessee, 322 U.S. 143, 152 n.7 (1944); White v. Texas, 310 U.S. 530, 531-32 (1940). As such, the per curiam opinion's ruling that this claim was procedurally barred, in addition to not clearly representing the view of the majority of the Florida Supreme Court, also appears "arbitrary" and thus not "adequate" to support a procedural default in federal court. See Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010).

anxiety, or fears do not render a confession involuntary, as the "Fifth
Amendment privilege is not concerned 'with moral and psychological pressures
to confess emanating from sources other than official coercion.'" Berghuis v.
Thompkins, 560 U.S. 370, 387 (2010) (quoting Colorado v. Connelly, 479 U.S.
157, 170 (1986) (quoting Elstad, 470 U.S. at 305)); id. ("The fact that [the
detective's] question referred to Thompkins' religious beliefs also did not
render Thompkins' statement involuntary"); see also Martin v. Wainwright,
770 F.2d 918, 925–26 (11th Cir. 1985) (rejecting that confession was
involuntary based on the defendant's "emotional mental state, particularly
when the discussion turned to the subject of religion"), opinion modified on
denial of reh'g, 781 F.2d 185 (11th Cir. 1986), abrogated on other grounds by
Davis v. United States, 512 U.S. 452 (1994), as recognized in Coleman v.
Singletary, 30 F.3d 1420, 1424-25 (11th Cir. 1994); Langlois v. Wainwright,
445 F.2d 836, 837 (5th Cir. 1971)[10] (defendant's claim that he confessed after
minister advised him to do so to "make it easier on himself" failed to support
that confession was coerced). Habeas relief is denied on Ground IV.

---

[10] Decisions of the Former Fifth Circuit handed down before the close of
business on September 30, 1981, are binding precedent in the Eleventh Circuit.
Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

**Ground V:   The Trial Court's Preclusion of Evidence to Impeach the Credibility of Sandra Brown**

In his final ground, Morrison asserts that the state trial court violated his rights under Sixth and Fourteenth Amendments to confront the witnesses against him and present a defense by precluding evidence impugning the credibility of Sandra Brown. (Pet. at 57-63; Pet. Brief at 24-25). Again, she lived across from the victim's apartment, and she testified that, on the night of the murder, Morrison was with her at her apartment until about 9:00 p.m., when he said he was going to take out the trash, but he failed return. Brown's testimony thus placed Morrison near the scene of the murder and suggested that he mysteriously disappeared that night.

Morrison asserts that the trial court violated his right to present evidence impeaching Brown in two ways. First, he claims the trial court improperly sustained the State's objection to a question his counsel posed to Brown on cross-examination, which Morrison contends would have shown she was aware that she was also a suspect in the eyes of police and thus had an interest in deflecting their attention to others. Second, Morrison points to the trial court's exclusion of testimony from Tims, who also lived in Brown's neighborhood, offered to show that Brown had a reputation for dishonesty. Morrison raised these claims on direct appeal (Doc. 23-30 at 109-115), and the

93

Florida Supreme Court denied relief. Although each claim is distinct, both relate to Brown's credibility and involve common procedural and substantive issues. The Court therefore addresses them together.

The Eleventh Circuit has summarized the applicable legal principles in this area as follows:

> While a district court has discretionary authority to limit cross-examination, this discretion is limited by the Confrontation Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; United States v. Maxwell, 579 F.3d 1282, 1295 (11th Cir. 2009). In particular, a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness. Maxwell, 579 F.3d at 1295-96. "Cross-examination, after all, 'is the principal means by which the believability of a witness and the truth of his testimony are tested.'" United States v. Mastin, 972 F.3d 1230, 1239 (11th Cir. 2020) (quoting Davis v. Alaska, 415 U.S. 308, 316 (1974)).

> However, the district court retains wide latitude to impose reasonable limits on cross-examination based on, among other things, confusion of the issues. Id. at 1240. The Confrontation Clause is violated only if a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination. Id. at 1239-40.

> Similarly, while the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," that right "is not absolute, and is subject to reasonable restrictions." United States v. Mitrovic, 890 F.3d 1217, 1221 (11th Cir. 2018). "[I]f the court permits a defendant to present the essence of his desired argument to the jury, his right to present a complete

defense has not been prejudiced." [United States v. Harris, 916 F.3d 948, 959 (11th Cir. 2019)].

United States v. Lewis, 40 F.4th 1229, 1246 (11th Cir. 2022)

Following the murder, the police interrogated Brown after she waived her Miranda rights. At trial, defense counsel sought to attack her credibility on cross-examination by implying that police had considered her a suspect as well and that she therefore had motive to deflect attention. In that vein, defense counsel asked Brown, "Police ever tell you, ma'am, that when you were brought down and read your rights, detective ever tell you that he didn't believe you had nothing to do with this?" Morrison Direct, 818 So. 2d at 447; (Doc. 23-20 at 13). The prosecutor objected without stating a specific ground, and the trial court sustained the objection, also without elaboration. Id. (Doc. 23-20 at 13-14). Defense counsel then proceeded on to another line of questioning. (Id. at 14).

Morrison's other claim relates to efforts to have Tims testify that Brown had a reputation for dishonesty. Under Fla. Stat. § 90.609, a party may use character evidence to attack the credibility of a witness if the evidence relates to the witness's reputation for truthfulness. "However, a foundation must first be laid to establish that the person testifying as to the witness's reputation is aware of the witness's reputation for truthfulness in the community." Lott v.

95

State, 695 So. 2d 1239, 1242 (Fla. 1997). "Essentially, it must be established that the community from which the reputation testimony is drawn is sufficiently broad to provide the witness with adequate knowledge to give a reliable assessment." Larzelere v. State, 676 So. 2d 394, 400 (Fla. 1996). "Reputation evidence must be sufficiently broad-based and should not be predicated on 'mere personal opinion, fleeting encounters, or rumor.'" Lott, 695 So. 2d at 1242 (quoting Rogers v. State, 511 So. 2d 526, 530 (Fla. 1987)).

On direct examination, defense counsel initially asked Tims whether she knew Brown's reputation in the community for truthfulness. Morrison Direct, 818 So. 2d at 449. The prosecutor objected, asserting that defense counsel had not laid a proper predicate for admission. Id. The trial court responded, "Okay. I'll overrule the objection for now." Id. Tims proceeded to answer the pending question, "Yes," stating that Brown had a reputation "[f]or not telling the truth." Id.

On cross-examination, however, the prosecutor sought to demonstrate that Tims' testimony was based only on her own limited personal experience:

> Q. Okay. Now, you say she had a reputation for not telling the truth; is that right?
>
> A. Uh-huh.
>
> …

Q. Who have you talked with, sat down and talked with about her reputation?

A. I have never sat down with nobody to talk, like, against her. I just heard them talking against her, and I done been in a situation, known that she had lied.

Q. All right. But nobody has ever come up to you and told you that Cassandra[11] is a liar, have they?

A. Yes.

…

Q. How many people have you talked with about this?

A. Well, I had an incident with her with Raymond's sister when Sandra told a lie about some things that weren't true.

Q. You know of one instance in which Cassandra told a lie to Raymond's sister?

A. That's involving me in there, in that lie, yes.

Q. When was that?

A. That was in 96.

Q. 96. What neighborhood were you living in at that time?

A. In Marietta.

…

---

[11] Tims testified that she knew Sandra Brown as "Cassandra."

97

Q. And that's the only incident that you know about that you were personally involved in and knew that Cassandra had told a lie?

A. This right here, this case right here, because when she come to court it be a different story that she tells me that you all told her that I said this.

Q. All right. That's what – based upon what she has told you?

A. Yes.

Q. All right. Not based upon what you have talked with Raymond's sister, or other people in the community?

A. No.

<u>Morrison Direct</u>, 818 So. 2d at 449-50 (footnote added). Considering the above, the state trial court struck Tims' testimony, because, in the court's view, her conclusion that Brown had a reputation for dishonesty appeared to be based just on an incident in which she had caught Brown in a lie on one occasion. <u>Id.</u> at 450.

On direct appeal, Morrison raised claims challenging both the trial court's ruling sustaining the objection to the question to Brown and its exclusion of Tims's testimony. (Doc. 23-30 at 109-115). Morrison argued that those actions limited his ability to impeach Brown's testimony in violation of his rights under the Sixth and Fourteenth Amendments, as well as the Florida Constitution and state court evidentiary rules. (<u>Id.</u> at 109, 113-14). In support

of his claims, Morrison also cited <u>Delaware v. Van Arsdall</u>, 475 U.S. 673 (1986); <u>Davis v. Alaska</u>, 415 U.S. 308 (1974); and <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973). (Doc. 23-30 at 113-14).

These two claims were addressed only in the <u>per curiam</u> opinion, which cited only Florida law and cases. <u>Morrison Direct</u>, 818 So. 2d at 447-48. First, the <u>per curiam</u> opinion recognized that defense counsel's question to Brown was objectionable as calling for hearsay, that is, what the detectives might have said to Brown, if such statements were being offered for their truth. <u>Id.</u> at 447 (citing Fla. Stat. § 90.801(1)(c)). However, the <u>per curiam</u> opinion acknowledged that a party has a right under Fla. Stat. § 90.608(2) to present evidence attacking the credibility of a witness for bias and that the question might have sought admissible non-hearsay because what the detective did or did not say to Brown might be relevant not for its truth but because it would inform Brown's knowledge of her status as a suspect and thus her potential bias. <u>Id.</u> at 446-47. Nevertheless, the <u>per curiam</u> opinion concluded that the trial court was not shown to have abused its discretion in sustaining the objection because defense counsel failed to alert the trial court of any relevant non-hearsay the question was seeking. <u>Id.</u> at 448. The <u>per curiam</u> opinion also intimated in a footnote that Morrison failed to "preserve the point for appeal,"

99

because he did not make an offer of proof of how Brown would have answered. Id. at 448 n.8 (quoting Fla. Stat. § 90.104(1)(b)). Finally, the per curiam opinion deemed any potential error harmless beyond a reasonable doubt. Morrison Direct, 818 So. 2d at 448. Specifically, the opinion explained that Detective Short had testified that he had read Brown her Miranda rights both at her apartment and at the police station and that Short felt "she could possibly have played a role in it," providing defense counsel with "ample opportunity" to explore what Short had said to Brown as might have been relevant to the latter's alleged bias. Id.

Turning to Tims' testimony regarding Brown's reputation for dishonesty, the per curiam opinion concluded that the trial court had not abused its discretion in determining that the defense had failed to lay the required predicate for admissibility under Florida law. Morrison Direct, 818 So. 2d at 451. "From the proffer as a whole," the per curiam opinion found, "the trial court was justified in concluding that Tims really did not know Brown's reputation in the community, and she was testifying only about a specific act of lying with which Tims was personally familiar." Id. The per curiam opinion also again recognized that any potential error was harmless beyond a

100

reasonable doubt, because Morrison's mother was permitted to testify that Brown's reputation in the community was that she is "a big liar." Id.

On habeas review in this Court, the State argues that the Florida Supreme Court rejected both claims on the merits and that its decision is entitled to deference and due to prevail under § 2254(d). (Resp. at 61-64). Morrison, on the other hand, contends that the Florida Supreme Court failed to address his argument "that that the answer to the question [to Brown] was admissible based on constitutional principles, not just state evidentiary principles." (Pet. Brief at 24). In other words, Morrison argues that the Florida Supreme Court only decided that claim insofar as it arose under Florida state law, not under federal law, and that, as a result, no deference is owed under § 2254(d). Morrison further contends in the alternative that the Florida Supreme Court's decision was contrary to established federal law providing that a defendant has broad leeway in conducting cross-examination relating to a witness's bias and motivations. (Pet. Brief at 24-25).

In his brief on direct appeal, Morrison presented these claims as arising under both federal and state law. But just how the Florida Supreme Court resolved them is again complicated by the fragmented nature of the decision. The per curiam opinion denied relief on the merits of both claims, finding that

101

the trial court did not abuse its discretion on either ruling, adding that any error was harmless beyond a reasonable doubt. However, that opinion cites only Florida law, evidentiary rules, and caselaw, not the United States Constitution, federal law, or federal court decisions. But again, the per curiam opinion is joined by only three justices and therefore does not represent the binding decision of the Court. See Ruiz, 504 F.3d at 527-28. The other four justices concurred in the result only, and none addressed either claim in a writing or otherwise revealed why they believed the claims did not entitle Morrison to relief. Nevertheless, just as those four justices comprised the majority as it related to the denial of Morrison's prior claim that the police unlawfully coerced his confession by appealing to religion, so, too, are they the majority on these claims regarding evidence going to Brown's credibility.

"'[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" Williams, 568 U.S. at 298 (quoting Richter, 562 U.S. at 99). That presumption "can in some limited circumstances be rebutted," however. Id. at 301-02. To assess whether the presumption is overcome, federal habeas courts "look to the state court's decision and the record in the case to

102

determine whether 'the evidence leads very clearly to the conclusion that the federal claim was inadvertently overlooked in state court.'" Childers v. Floyd, 736 F.3d 1331, 1334 (11th Cir. 2013) (en banc) (Childers II) (quoting Williams, 568 U.S. at 303) (alteration adopted) (footnote omitted).

The four justices concurring in the result rejected these claims without explanation. Under Richter and Johnson v. Williams, it is presumed they considered these claims as federal ones and denied them on the merits. Likewise, even though the per curiam opinion "expressly analyzed [Morrison's] claim [regarding the question to Brown] under only the Florida rules of evidence, the underpinnings of these rules fit hand in glove with the rights guaranteed under the Confrontation Clause." Childers II, 736 F.3d at 1335; see also Childers v. Floyd, 642 F.3d 953, 968-72 (11th Cir. 2011) (en banc) (Childers I), vacated and remanded, 560 U.S. 1190 (2013), reinstated by Childers II. Morrison does not present the Court with evidence or argument to overcome the presumption as to either claim. The Florida Supreme Court is thus deemed to have rejected his federal claims on the merits, and, in turn, its adjudication is entitled to deference under § 2254(d).

Because the four concurring justices rejected these claims without stating reasons, it would be further presumed for purposes of review under §

103

2254(d), that they adopted any reasons expressly stated by the trial court in support of its rulings, absent evidence to the contrary. See Wilson, 584 U.S. at 125. This Court would then review those reasons to assess whether the decision to affirm was objectively unreasonable. See id. To the extent that the trial court did not explain a ruling, this Court is required to consider all reasons that could have supported the Florida Supreme Court's unexplained affirmance. See Richter, 562 U.S. at 102. Such might include raising that a state court could have determined that any error was harmless beyond a reasonable doubt, see Chapman v. California, 386 U.S. 18, 24 (1967); Frye v. Broomfield, 115 F.4th 1555, 1163, 1164-65 (9th Cir. 2024), a reason that would itself be entitled to deference under § 2254(d), see Brown v. Davenport, 596 U.S. 118, 127 (2022).

Neither the trial court nor the four concurring justices on appeal expressed a rationale for disallowing defense counsel's question to Brown about whether, the police had told her during their interrogation that they did not believe she was involved in the murder. They could have found, however, that such ruling did not violate Morrison's right of confrontation, and such a determination would not be contrary to, or an unreasonable application of clearly established Supreme Court precedent. "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-

104

examination that is effective whatever way, and to whatever extent, the defense might wish.'" Id. at 972-73 (quoting United States v. Owens, 484 U.S. 554, 559 (1988), quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987)) (emphasis in Owens and Childers). Here, the trial court did not restrict all inquiry into Brown's potential bias and did allow evidence showing that she had herself been interrogated by police after being read her Miranda rights. See Childers I, 642 F.3d at 975-980.

That dovetails into a recognition that the four concurring justices could have also determined, as the three justices joining the per curiam opinion did, that, any potential error in precluding Brown from answering the question was harmless beyond a reasonable doubt. Such would also not be contrary to, or an unreasonable application of, Supreme Court precedent. As the per curiam opinion recognized, the jury heard evidence that the police read Brown her Miranda rights on two occasions and interrogated her thereafter. Those circumstances themselves strongly suggest that the police considered Brown a suspect, a fact also confirmed by Detective Short's trial testimony acknowledging that be believed at that time that Brown could have been involved. See Sornberger v. City of Knoxville, Ill., 434 F.3d 1006, 1018 (7th Cir. 2006) ("The administration of Miranda warnings gave clear indication to [the

105

defendant] that she was considered a suspect ….”). Brown, of course, knew that she had been read her rights under Miranda and interrogated by police, from which a reasonable person could have easily gleaned that the investigation was then encompassing her own potential involvement. The jury could have, in turn, inferred from those same circumstances that Brown might have been so aware. The notion that further allowing Morrison's counsel to elicit from Brown the highly ambiguous answer counsel presumably desired, that is, that the police did not expressly advise Brown that they did not consider her a suspect, would materially alter the jury's assessment of Brown's potential bias is fanciful. A fortiori, such an answer would also have no likelihood to affect the jury's broader calculus of Morrison's guilt, particularly given the strong evidence against him, including his inculpatory statements to police. Habeas relief is denied on this claim.

Turning to Morrison's claim regarding the exclusion of Tims's testimony that Brown had a reputation for dishonesty, the four justices concurring in the result could have determined that such ruling did not violate Morrison's constitutional right to present a defense. Such would not be contrary to, nor an unreasonable application of, clearly established precedents of the United States Supreme Court, nor would they be based on an unreasonable

106

determination of the facts. Morrison cites no case of the Supreme Court of the United States (or any other court, for that matter), clearly establishing that the United States Constitution requires admission of evidence of a witness's reputation in the community for untruthfulness. See Nevada v. Jackson, 569 U.S. 505, 512 (2013) (["T]his Court has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." (emphasis original)). Even assuming for the sake of argument such might at times be required as a general principle, see generally Rule 608(a), Fed. R. Civ. P., state courts would retain substantial discretion to exclude such evidence on the ground that its proponent failed to establish the a reasonable and necessary foundation under applicable evidentiary rules, see United States v. Watson, 669 F.2d 1374, 1381 (11th Cir. 1982), and the Florida Supreme Court could have reasonably found the state trial court did not abuse that discretion here.

The Florida Supreme Court would also again not be objectively unreasonable in determining, as the per curiam opinion did, that any potential error in excluding Tims's testimony was harmless beyond a reasonable doubt. As the per curiam opinion recognized, Morrison's mother was permitted to testify that Brown had a reputation in the community for untruthfulness.

107

Morrison concedes that Tims' testimony would have been to the same effect. Nevertheless, he asserts the jury would have been more likely to credit Tims' testimony than that of a mother testifying on her son's behalf. That is reasonable to assume, but the Florida Supreme Court was still not objectively unreasonable in concluding that any error was harmless considering Morrison's mother's testimony in conjunction with the other evidence of Morrison's guilt, including his inculpatory statements to police. See Saiz v. Ortiz, 392 F.3d 1166, 1184-85 (10th Cir. 2004). Habeas relief is also denied on Ground V.

To the extent that the Petition contains additional claims not specifically discussed herein, they are denied as procedurally defaulted or, alternatively, on the merits.

## VI. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Morrison seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Morrison "must demonstrate that reasonable jurists would find the district court's assessment of the

108

constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

109

2.     The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.     If Morrison appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this _11th_ day of ___May___, 2026.

_____
HARVEY E. SCHLESINGER
United States District Judge

110